Argued May 2, opinion affirmed July 25, 1978

# REDMOND READY-MIX, INC., *Appellant,*
## *v.*
# COATS et ux, *Respondents.*
## (TC 18622, SC P-2510)
### 582 P2d 1340

David G. Knibb, of Schweppe, Doolittle, Krug, Tausend & Beezer, Seattle, Washington, argued the cause for appellant. With him on the briefs was Dennis C. Karnopp, of Panner, Johnson, Marceau, Karnopp & Kennedy, Bend.

James H. Clarke, of Dezendorf, Spears, Lubersky & Campbell, Portland, argued the cause for respondents. With him on the brief was Wayne Hilliard, James H. Clarke and Stanley R. Loeb, of Dezendorf, Spears, Lubersky & Campbell, Portland.

TONGUE, J.

**TONGUE, J.**

This is a suit under the Oregon Anti-Price Discrimination Law, ORS 646.010 et seq., between competitors in the ready-mix concrete industry in Deschutes and Jefferson Counties. Plaintiff's complaint seeks damages and an injunction based upon allegations that defendants engaged in "geographic" price discrimination in violation of ORS 646.040(1).[1] Defendants denied liability and alleged several affirmative defenses, including the defense that defendants' prices were "made in good faith to meet the prices believed to have been charged by * * * plaintiff," as provided by ORS 646.050.

The trial court found, after a two-week trial, that although defendants sold concrete at lower prices in Redmond than in Bend, they had no "predatory intent" in doing so; that defendants were not selling below their average cost, and that plaintiff's damages, if any, were not the proximate result of defendants' conduct. The trial court also found that "the ready-mix market in the Redmond area has stabilized" and that plaintiff "has been able to hold 70% of the market."

Plaintiff appeals and contends that the trial court erred in failing to find that defendants' "geographic" price discrimination was illegal. This being a suit in equity, we must review the record de novo.

Plaintiff, Redmond Ready-Mix, Inc., is the smaller of two companies competing for retail sales of ready-mix (pre-mixed) concrete in the Redmond and Madras areas. Defendants Robert Coats and his wife are the owners and operators of Deschutes Ready-Mix, Sand & Gravel Co. A third company, not a party to this suit, sells primarily in the Bend area and is the only other ready-mix producer in Deschutes and Jefferson Counties. The geology of Central Oregon is such that

---

[1] Plaintiff's complaint also alleged as a separate cause of suit that defendants sold their concrete below cost, in violation of (former) ORS 646.100. That contention, however, is not in issue on this appeal.

"aggregate," necessary to the production of ready-mix concrete, is available in limited quantities.

Plaintiff is a wholly-owned subsidiary of Mid-Oregon Crushing, Inc. (MOC). Plaintiff bought the assets of Mr. Thomas Stearns' ready-mix concrete business in Redmond on August 1, 1973, as an outlet for surplus aggregate developed in MOC's rock crushing business. Plaintiff purchased Stearns' operation for $90,000, paying $15,000 down. The description by the trial court of plaintiff's entry into the business (with which we agree after examination of the record) is as follows:

> "You get the distinct impression that the plaintiff purchased from Stearns an outfit held together by 2x4's and baling wire. Stearns had old equipment and part-time employees. Johnnie and Purdy had the task of converting the Stearns' business into a company capable of competing with the defendant on an even footing. They had only $10,000 of initial capital and no previous ready-mix experience. They were required to buy their aggregate from Mid-Oregon Crushing. As time went along they were able to improve the plant, replace some of the rolling stock and buy one Riteway truck."

Defendants have an integrated operation including ready-mix concrete, road construction, grading, rock crushing and asphalt paving. Overhead and certain fixed costs are spread over all these operations. Seasonal variations in one operation permit multiple use of equipment and personnel in others. The description by the trial court of defendants' business (with which we also agree) is as follows:

> "On the other hand, the defendant had a well established modern ready-mix plant. It had its own aggregate source. It had adequate capital and experienced personnel. The defendants' rolling stock was up-to-date, including 3 Riteway trucks. This Court does not understand it completely, but somehow the batch plant was tied to a computer. Coats told his personnel to stress service. The defendant had customer contacts of long standing. * * *"

[ 104 ]

Since 1964 defendants operated a ready-mix plant in Bend. In 1969 defendants purchased a plant in Madras and in 1974 they opened a plant in Redmond. They then ceased making deliveries to Redmond from the Bend and Madras plants, as in previous years.

Plaintiff's charge of unlawful price discrimination is based upon the allegation that defendants sold concrete in Redmond and in Jefferson County for less than the price at which they sold concrete in Bend. In support of that allegation plaintiff has submitted a table comparing "Defendants' Net Delivered Prices in Bend and Redmond," including bid sales.[2] Plaintiff

---

2

*TABLE A: DEFENDANTS' AVERAGE NET DELIVERED PRICES IN BEND AND REDMOND* (Dollars per yard)

| MONTH | BEND | REDMOND | DIFFERENCE |
|---|---|---|---|
| Aug. 1973 | 22.40 | 14.90 | —7.50 |
| Sept. | 23.20 | 18.20 | —5.00 |
| Oct. | 23.00 | 18.60 | —4.40 |
| Nov. | 24.00 | 19.90 | —4.10 |
| Dec. | 23.80 | 20.70 | —3.10 |
| Jan. 1974 | 25.00 | 19.00 | —6.00 |
| Feb. | 27.30 | 20.20 | —7.10 |
| Mar. | 26.80 | 18.40 | —8.40 |
| Apr. | 26.10 | 19.50 | —6.60 |
| May | 25.00 | 22.20 | —2.80 |
| June | 24.40 | 20.50 | —3.90 |
| July | 26.20 | 23.00 | —3.20 |
| Aug. | 26.90 | 23.00 | —3.90 |
| Sept. | 26.00 | 23.00 | —3.00 |
| Oct. | 26.00 | 23.60 | —2.40 |
| Nov. | 26.00 | 24.10 | —1.90 |
| Dec. | 28.00 | 24.20 | —3.80 |
| Jan. 1975 | 26.30 | 24.40 | —1.90 |
| Feb. | 27.00 | 24.50 | —2.50 |
| Mar. | 26.00 | 23.70 | —2.30 |
| Apr. | 26.50 | 25.50 | —1.00 |
| May | 25.60 | 24.10 | —1.50 |
| June | 26.10 | 24.00 | —2.10 |
| July | 25.50 | 24.10 | —1.40 |
| Aug. | 25.60 | 24.20 | —1.40 |
| Sept. | 25.80 | 25.10 | —0.70 |
| Oct. | 27.60 | 23.70 | —3.90 |
| Nov. | 28.10 | 25.00 | —3.10 |
| Dec. | 26.20 | 24.60 | —1.60 |
| Jan. 1976 | 27.30 | 25.20 | —2.10 |

has also submitted a table comparing plaintiff's and defendants' "Net Delivered Prices in Redmond Area," showing that defendants' net prices in the Redmond area were less than the prices charged by plaintiff in that area, including bid sales.[3]

There was some disagreement at trial as to what constitutes a "bid sale." Based upon the evidence in this case, it appears that the basic test of a bid sale, for purposes of this case, was whether the price was based on the nature of the particular job. If it was, it was considered to be a bid sale whether the sale was large or small, written or oral. Both parties "went off" their price lists on bid sales.

---

The table submitted by plaintiff shows defendants' Redmond prices as $3.60 lower between August 1973 and June 1974 than the actual "average net prices." Plaintiff's explanation was that during that period (prior to the opening of defendants' plant in Redmond) defendants made sales in Redmond from its plant in Bend, but charged no delivery fee during that period and that they normally would charge $3.60 per yard for a 12-mile delivery. Defendants deny that this deduction of $3.60 was proper for the purpose of computing "net delivered prices." Because of the basis on which this case is decided, it is not necessary to also decide that question.

3

*TABLE B: AVERAGE NET DELIVERED PRICES IN REDMOND AREA*

| MONTH | DEFENDANTS' PRICE | PLAINTIFF'S PRICE | EXTENT DEFENDANTS' REDMOND PRICE WAS LOWER |
|---|---|---|---|
| Aug. 1973 | 14.90 | 21.70 | —6.80 |
| Sept. | 18.20 | 22.20 | —4.00 |
| Oct. | 18.60 | 22.00 | —3.40 |
| Nov. | 19.90 | 22.80 | —2.90 |
| Dec. | 20.70 | 21.50 | —0.80 |
| Jan. 1974 | 19.00 | 22.60 | —3.60 |
| Feb. | 20.20 | 26.00 | —5.80 |
| Mar. | 18.40 | 25.80 | —7.40 |
| Apr. | 19.50 | 23.00 | —3.50 |
| May | 22.20 | 24.50 | —2.30 |
| June | 20.50 | 23.90 | —3.40 |
| July | 23.00 | 26.10 | —3.10 |
| Aug. | 23.00 | 26.40 | —3.40 |
| Sept. | 23.00 | 25.80 | —2.80 |
| Oct. | 23.60 | 25.50 | —1.90 |
| Nov. | 24.10 | 24.50 | —0.40 |
| Dec. | 24.20 | 23.80 | +0.40 |

Plaintiff's cause of suit was predicated upon defendants' alleged discrimination in *price lists,* not *bid* sales, and trial proceeded on that basis. Consequently, comparison of prices which include bid sales is misleading, if not inaccurate, in considering whether there was discrimination in defendants' price lists between Redmond and Bend.

In our examination of the evidence we have also compared plaintiff's price lists with defendants' price lists in Bend and Redmond.[4] That evidence shows that

| | | | |
|---|---|---|---|
| Jan. 1975 | 24.40 | 25.50 | —1.10 |
| Feb. | 24.50 | 23.80 | +0.70 |
| Mar. | 23.70 | 23.80 | —0.10 |
| Apr. | 25.50 | 24.20 | +1.30 |
| May | 24.10 | 25.20 | —1.10 |
| June | 24.00 | 24.80 | —0.80 |
| July | 24.10 | 26.80 | —2.70 |
| Aug. | 24.20 | 24.50 | —0.30 |
| Sept. | 25.10 | 24.90 | +0.20 |
| Oct. | 23.70 | 26.40 | —2.70 |
| Nov. | 25.00 | 26.00 | —1.00 |
| Dec. | 24.60 | 26.60 | —2.00 |
| Jan. 1976 | 25.20 | 27.00 | —1.80 |

Again, the table submitted by plaintiff showed defendants' Redmond area prices as $3.60 lower between August 1973 and June 1974 than the "average net prices" for the same reasons as stated in n.2.

4

*TABLE C: "5-SACK" CONCRETE PRICE LISTS (per cubic yard)*
(Excluding discounts available)

| ANNOUNCED | EFFECTIVE | PLAINTIFF | DEFENDANTS-REDMOND | DEFENDANTS-BEND |
|---|---|---|---|---|
| 8/25/73 | 9/1/73 | $22.00 | | |
| 8/14/73 | 9/1/73 | | $26.50/$24.50 | $27.00/$25.00 |
| 2/1/74 | 2/1/74 | $25.50 | | |
| 1/16/74 | 2/1/74 | | $27.50/$25.50 | $29.00/$27.00 |
| 7/1/74 | 7/1/74 | $27.00 | | |
| | 7/1/74 | | $28.00/$26.00 | $29.00/$27.00 |
| 11/7/74 | 11/7/74 | $25.25 | | |
| 4/1/75 | 4/1/75 | $26.75 | | |
| | 4/1/75 | | $30.50/$28.50 | $30.50/$28.50 |
| 10/20/75 | 11/1/75 | $28.00 | | |
| | 11/30/75 | | $29.65/$27.65 | $30.50/$28.50 |
| 2/9/76 | 2/26/76 | $30.50 | | |
| | 3/8/76 | | $32.50/$30.50 | $32.00/$30.00 |

defendants' Redmond price for 5-sack concrete was less than their Bend price at various times during the period in question. It also appears, however, that effective April 1, 1975, defendants' prices in Bend and in Redmond were the same and that effective March 8, 1976, defendants' prices in Redmond were higher than defendants' prices in Bend.

Defendants' price lists show a usual delivery charge of 30 cents per cubic yard per mile beyond the Bend city limits. Plaintiff had a "free delivery" zone extending five miles beyond the Redmond city limits. Until defendants opened their Redmond plant in July 1974 their deliveries to the Redmond area were made from their Bend or Madras plants. During that period, however, defendants did not charge for deliveries in that area for sales under the Redmond price list.

Finally, it appears from the evidence that a comparison of the total cubic yards of concrete sold by plaintiff and by defendants in the "Redmond area," including bid sales, for each year during the period 1971 to and including 1975, with plaintiff's percentage of the total sales for each of these years, was as follows:

| YEAR | PLAINTIFF | DEFENDANTS | PLAINTIFF'S PERCENT OF TOTAL |
|---|---|---|---|
| 1971 | 7,374[5] | 938 | 89% |
| 1972 | 10,757[5] | 1,705 | 87% |
| 1973 | 13,776[5] | 2,389 | 85% |
| 1974 | 9,065 | 3,197 | 74% |
| 1975 | 10,074 | 3,508 | 74% |

"5-sack mix" is a standard concrete mix, rated at 3,000 psi. There are 94 pounds of cement per sack, hence a 5-sack mix has 470 pounds of cement. Although both parties' price lists reflect prices for other rated concrete it is sufficient for our purposes to compare only the 5-sack mix.

Defendants had two prices: a retail price and a contractor's price, $2 per yard lower than retail price.

[5] The sales for the years 1971, 1972 and through July 1973 were made by the prior owner of plaintiff's plant.

It appears from the evidence that the "Redmond area," for the purposes of this comparison, was a market area extending from the Deschutes Junction (between Bend and Redmond) north to the Deschutes-Jefferson County line.

The trial court found, with reference to the "Redmond area," that plaintiff had "been able to hold 70% of the market." As previously stated, the trial court also found that defendants did not sell concrete in the Redmond area below cost.[6]

Plaintiff contends that defendants engaged in "geographic" price discrimination in violation of ORS 646.040(1).[7] Defendants deny such a violation and contend that, even if there were a violation, they

___

[6] As stated in n.1, plaintiff's complaint included as a separate cause of suit that defendants sold their concrete below cost, in violation of (former) ORS 646.100. That cause of suit was dismissed by the trial court based upon its finding of fact to the contrary and is not in issue on this appeal.

[7] ORS 646.040 provides:

"(1) It is unlawful for any person engaged in commerce or food commerce, or both, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities, or services or output of a service trade, of like grade and quality or to discriminate in price between different sections, communities or cities or portions thereof or between different locations in sections, communities, cities or portions thereof in this state, where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.

"(2) Subsection (1) of this section does not prevent:

"(a) Differentials which make only due allowance for differences in the cost of manufacture, sale or delivery, resulting from the differing methods or quantities in which the commodities are sold or delivered to purchasers.

"(b) Persons engaged in selling goods, wares or merchandise, or service or output of a service trade, in commerce from selecting their own customers in bona fide transactions and not in restraint of trade.

"(c) Price changes from time to time where in response to changing conditions affecting the market for or marketability of the goods concerned, such as but not limited to actual or imminent deterioration of perishable goods, obsolescence of seasonal goods, distress sales under court process, or sales in good faith in discontinuance of business in the goods concerned."

[ 109 ]

established their affirmative defense of "justification," as defined in ORS 646.050, by showing that their lower prices were made in good faith to meet the prices of plaintiff, as their competitor.[8] Because of the basis on which we decide this case it is unnecessary to reach the question of "justification."

■ ORS 646.010 to 646.180, the Anti-Price Discrimination Law, enacted in 1937, was modeled after the Robinson-Patman amendment, adopted in 1936, to the Clayton Act.[9] In particular, ORS 646.040 is comparable with § 2(a) of the Robinson-Patman Act, 15 USC § 13(a) (1976). Under such circumstances federal cases interpreting the federal statutes are persuasive to us in interpreting the Oregon statute. *Cf. Pac. Supply Coop. v. State Tax Comm.,* 224 Or 556, 560, 356 P2d 939 (1960); *Peters v. Central Labor Council,* 179 Or 1, 7, 169 P2d 870 (1946); *U. of O. Co-oper. v. Dept. of Rev.,* 273 Or 539, 544, 542 P2d 900 (1975).

Much of the "federal law" on this subject is in a recognized state of confusion, partly as the result of conflicting decisions by the federal courts.[10] A large part of the problem arises from the difficulty in reconciling (1) the Sherman Act anti-trust public policy of promoting healthy competition for the benefit of the consumer public in lower prices with (2) the

---

[8] ORS 646.050 provides:

"* * * Upon proof being made, in any suit or other proceeding in which any violation of ORS 646.010 to 646.180 is at issue, that there has been discrimination in price, or in services or facilities furnished, or in payment for services or facilities rendered or to be rendered, the burden of rebutting the prima facie case thus made by showing justification is upon the person charged with the violation; but this section does not prevent a seller rebutting the prima facie case so made by showing that his lower price, or the payment for or furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor."

[9] The Clayton Act, 15 USC §§ 12-27 (1976), was first enacted in 1914.

[10] *See e.g.,* Sullivan, Handbook of the Law of Antitrust 684-689 (1977), and Austern, *Presumption and Percipience About Competitive Effect Under Section 2 of the Clayton Act,* 81 Harv L Rev 773, 789-790, 817-819 (1968).

public policy implicit in §§ 2(a) and 4 of the Robinson-Patman Act, prohibiting discrimination in prices and permitting any injured person to seek protection from price reductions by competitors which may have a detrimental effect on competition.[11] Because, however, this case involves an Oregon statute, we are free, for the purpose of the interpretation and application of that statute, to adopt what we consider to be the "better" law as stated by the courts and by recognized legal writers on this subject.

It is recognized that to establish a prima facie case under § 2(a) of the Robinson-Patman Act plaintiff must establish (1) a discrimination "in price between purchasers of commodities" and (2) that "the effect of such discrimination may be" (a) "substantially to lessen competition" or (b) "tend to create a monopoly in any line of commerece," or (c) "to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination or with customers of either of them." The same requirements must be satisfied by reason of the almost identical terms of ORS 646.040(1).

Plaintiff's complaint in this case, however, alleges that defendants engaged in illegal price discrimination which violated each of these three statutory requirements.[12]

1. *Defendants discriminated in prices between Bend and Redmond area purchasers.*

---

[11] *See* Rowe, Price Discrimination Under the Robinson-Patman Act 125-132, § 6.5 (1962); Sullivan, *supra,* n.10 at 682.

[12] As stated in Rowe, *supra,* n.11 at 126, a recognized authority on this subject and one relied upon by plaintiff in its brief:

"Fundamentally, the statutory distinctions have not been meaningful in practice since only test (*3*) concerning harm to *competition with grantors or recipients* of discriminations has been important in price discrimination cases. The effect of a pricing practice should normally register on competition *with* individual firms long before its impact is felt over an entire 'line of commerce' or is instrumental in building 'monopoly.' Inasmuch as a demonstration of competitive effects under *any one* of the alternative tests gives rise to a prima facie violation, no incentive exists to extend the inquiry and proof beyond this least exacting criterion."

[ 111 ]

In considering whether defendants' conduct violated ORS 646.040(1), we begin with the question whether defendants in fact discriminated in prices charged to purchasers of concrete. From the facts as previously stated, it is clear that defendants charged less for concrete sold in the Redmond area than in the Bend area. This difference was further accentuated in the period prior to July 1974 by the fact that defendants did not charge for Redmond area deliveries, but did charge for Bend area deliveries beyond the 8-mile "free zone."

In *FTC v. Anheuser-Busch,* 363 US 536, 549 (1960), the United States Supreme Court held that:

> "* * * [A] price discrimination within the meaning of that provision [§ 2(a) of the Robinson-Patman Act] is merely a price difference."

Similarly, we hold that the difference in prices charged by defendants in the two geographic areas was a "discrimination" under ORS 646.040(1).

■ Plaintiff does not make out a case under ORS 646.040(1), however, by merely showing that defendants discriminated in price. It is true that ORS 646.050 states that:

> "Upon proof being made, in any suit or other proceeding in which any violation of ORS 646.010 to 636.180 is at issue, that there has been discrimination in price, or in services or facilities furnished, or in payment for services or facilities rendered or to be rendered, the burden of rebutting the prima facie case thus made by showing justification is upon the person charged with the violation; * * *."

The United States Supreme Court has explained the comparable provision (§ 2(b)) of the Robinson-Patman Act[13] by holding that this provision "was inserted in the House bill for the sole purpose of laying down 'directions with reference to procedure including a statement with respect to burden of proof' " and that it

---

[13] 15 USC § 13 (b) (1976).

was "clearly not intended to have an independent substantive weight of its own."[14]

Thus, the Federal Trade Commission, as well as most federal courts, hold that a plaintiff must also prove that "the effect of the discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy or prevent competition" between plaintiff and defendants.[15] We also interpret ORS 646.050 to the same effect.

2. *Plaintiff did not prove that defendants' price discriminations had the proscribed effects on competition.*

Plaintiff contends that "the basic issue is *possible,* as distinct from *actual,* competitive impact." In *Corn Products Co. v. FTC,* 324 US 726, 738 (1945), the court stated:

> "* * * [T]he use of the word 'may' was not to prohibit discriminations having 'the mere possibility' of those consequences [to substantially lessen competition], but to reach those which would *probably* have the defined effect on competition." (Emphasis added)

However, the court also stated (at 742) that:

> "* * * [T]he statute does not require that the discriminations must in fact have harmed competition, but only that there is a *reasonable possibility* that they 'may' have such an effect." (Emphasis added)

This latter phrase was again used by the United States Supreme Court in *FTC v. Morton Salt Co.,* 334 US 37, 46 (1947).[16]

---

[14] *FTC v. Simplicity Pattern Co.,* 360 US 55, 70 (1959). *See also* Rowe, *supra,* n.11 at 108-109.

[15] *See* Rowe, *supra,* n.11 at 111, and cases cited therein.

[16]The dissent contended, to the contrary, that:

> "It is true that [the *Corn Products*] opinion uses the language as to possibility of injury now quoted in part by the Court as the holding of that case. But the phrase appears in such form and context and is so irreconcilable with the earlier careful and complete statement set out above, that the inconsistency must appear to a fair reader as one of those inadvertencies into which the most careful judges sometimes fall." 334 US at 57-58.

It appears, however, that the Federal Trade Commission has placed little reliance on the "possibility" test; that it has not been applied by the federal courts in subsequent cases; and that, on the contrary, the "reasonable probability" test appears to have been subsequently adopted by what we consider to be the better cases and authorities. *See e.g., Balian Ice Cream Co. v. Arden Farms Co.,* 231 F2d 356, 368 (9th Cir 1955), *cert denied* 350 US 991 (1956), citing *Moore v. Meads Fine Bread Co.,* 348 US 115, 118 (1954); *Lloyd A. Fry Roofing Co. v. FTC,* 371 F2d 277, 281 (7th Cir 1966); *Foremost Dairies, Inc. v. FTC,* 348 F2d 674, 681 (5th Cir), *cert denied* 382 US 959 (1965). *See also* Austin, Price Discrimination and Related Problems Under the Robinson-Patman Act 43 (1959), and cases cited therein.

As also stated by Rowe, Price Discrimination Under the Robinson-Patman Act 138 (1962):

"* * * In any moderate and realistic application of the statute to adverse competitive consequences, the 'reasonable probability' formulation doubtless sounds more appropriate and compatible with the doctrines prevailing under other sections of the Clayton Act."

Indeed, the distinction between "possibility" and "probability" is not only a familiar one, but lawyers, judges and juries are constantly called upon to make that distinction in many, if not most, cases involving the issue of causation. Accordingly, we hold that ORS 646.040(1) requires that plaintiff prove that defendants' price discrimination "probably" had the proscribed effect on competition.

It is also important to note that the statutes are concerned with injury to *competition,* not injury to a competitor. As stated in *Anheuser-Busch v. FTC,* 289 F2d 835, 840 (7th Cir 1961):

"The Act is really referring to the effect upon competition and not merely upon competitors. * * * In this respect § 2(a) must be read in conformity with the public policy of preserving competition, but it is not

concerned with mere shifts of business between competitors. It is concerned with substantial impairment of the vigor or health of the contest for business, regardless of which competitor wins or loses. The competition which is sought to be protected by this section is a contest between sellers for the buyer's business, because 'competition is, in its very essence, a contest for trade.' [Citing cases] 'Competition * * * is a battle for something that only one can get; one competitor must necessarily lose.' [Citing cases] 'Anti-trust legislation is concerned primarily with the health of the competitive process, not with the individual competitor who must sink or swim in competitive enterprise. [Citing cases]"

*See also* Edwards, The Price Discrimination Law 531 (1959).

(A) *Plaintiff did not prove that defendants' price discriminations were made with "predatory intent."*

■ Before the adoption of the Robinson-Patman amendments, § 2 of the Clayton Act forbade predatory price discrimination. *See Porto Rico Amer. Tobacco Co. v. Amer. Tobacco Co.,* 30 F2d 234, 236 (2d Cir), *cert denied* 279 US 858 (1929). The legislative history of the Robinson-Patman Act also reveals that the almost exclusive "primary-line" worry was "predation" by large multi-market firms.[17] Of specific concern was the exchange of short-term profits for long-range monopoly benefits. See Note, *The "Injury" Requirement of the Robinson-Patman Act,* 49 NWU L Rev 197, 215 (1954).

■ Intent is not essential to a violation of either § 2(a) of the Robinson-Patman Act or of ORS 646.040(1). *See Balian Ice Cream Co. v. Arden Farms Co., supra* at 369. Where, however, the intent to destroy a com-

---

[17] A "primary line" case is one involving a line of commerce in which the discriminating seller and its competitors are engaged and directly compete, as distinguished from a "secondary line" case, involving a line of commerce in which the recipients of the discriminatorily priced goods are engaged. *See* Sherwood, *Robinson-Patman Act Primary Line Injury: Meanderings from Porto Rico to Utah—and Beyond,* 16 UCLA L Rev 304, 305 (1969). *See also* Rowe, *supra,* n.11, 141, 172.

[ 115 ]

petitor is found to exist, it has been held that price discrimination with such an intent is prima facie illegal. As stated in *Rowe, supra* at 149:

"* * * [P]revailing legal doctrines hold that predatory price discrimination on the part of a seller *designed to destroy* the competition of a smaller and weaker rival is prima facie illegal under Section 2(a). In such cases, the illicit motivation may be either express, or implied from pregnant circumstances such as deep, sustained undercutting or below-cost selling."

*See also Utah Pie Co. v. Continental Baking Co.,* 386 US 685, 702-703 (1967).

Plaintiff contends that there is direct evidence of defendants' predatory intent. Plaintiff's employee testified "under the rule" as to a conversation he had with defendant Coats in the spring of 1973:

"Q. * * * What if anything did Mr. Coats say regarding any competitors of his?

"A. The conversation was maybe directed at asphalt paving or crushing or some doggone thing in the commercial lines and his—rather than buying someone out, I don't know who directly it was directed at, he would rather spend 50 or $100,000 to break somebody than to buy them out.

"Q. Do you know to who that comment was directed?

"A. No, not the person it was directed at, no.

"Q. Do you know the context in which he made that comment?

"A. No, I'm not sure who it was directed at. This is the thing—no.

"Q. How did it come up?

"A. Just in general conversation, just in discussion, just talking, just some of the things that we were talking about. I don't know—just something that came up in the conversation about competition."

■ Assuming that this testimony was admissible and also assuming that Mr. Coats made the remark that he "would rather spend 50 or $100,000 to break somebody than to buy them out," this remark, standing alone,

does not necessarily prove that defendants sold concrete in the Redmond area at a lower price with "predatory intent." In our opinion, this testimony, in and of itself, was insufficient evidence of predatory intent. *Cf. Porto Rica Amer. Tobacco Co. v. Amer. Tobacco Co.,* 30 F2d 234, 237 (2d Cir), *cert denied* 279 US 858 (1929); *E. B. Muller Co. v. FTC,* 142 F2d 511 (6th Cir 1944); *Moore v. Mead's Fine Bread Co.,* 348 US 115, 118 (1954). *See also* discussion in *Rowe, supra* at 145-146.

It has been held, however, as stated in Note, *Unlawful Primary Line Price Discrimination: Predatory Intent and Competitive Injury,* 68 Colum L Rev 137, 141 (1968), that:

> "In the absence of direct proof of the price cutter's state of mind, predatory intent may be inferred from conduct that cannot benefit the actor except by injuring competition * * *."

Accordingly, the courts have inferred predatory intent from "below cost" sales or "deep and sustained undercutting" of a rival's price. *Id.* at 145-146. Rose, *supra* at 146.[18]

As previously stated, defendants' prices in the Bend area were at times lower than plaintiff's prices. We find, however, that these "undercuttings" were neither "deep" nor "sustained." As demonstrated in the table

---

[18] As stated in a Note, *Unlawful Primary Line Price Discrimination: Predatory Intent and Competitive Injury,* 68 Colum L Rev 137, at 146 (1968), stating that:

> "When a seller undersells his competitors by a wide margin for a long time, courts have considered his conduct a sign of predatory intent, even when the sales are not below costs. * * * The large discrepancy between the price cutter's price and his competitors' shows that he is not just trying to find a stable price that will attract more customers, but is probably financing temporary low prices with high prices in other markets. That he has not had to go below cost is likely to be a coincidence.

> "* * * [D]eep and sustained underselling is not proof of a violation in the absence of advantages in size and strength. Likewise, a temporary large difference in price, like temporary sales below cost, may be legitimate and even beneficial. Hence the requirement that the underselling be not only deep, but sustained."

set forth above, there was never any large difference between defendants' "5-sack" concrete list prices and plaintiff's comparable price lists. Indeed, during some periods defendants' prices were not lower than plaintiff's prices.[19] As also previously stated, defendants did not sell below cost. The trial court found that defendants had no predatory intent. After examining the record, we agree with that finding.

(B) *Plaintiff did not prove that defendants' price discriminations resulted in a substantial impairment of competition.*

As stated by Rowe, *supra* at 150-151:

"In the absence of predation, the statutory impairment of competition on the seller level presupposes an actual competitive dislocation * * * Earlier FTC doctrines which perceived an adverse competitive effect merely by reference to the seller's retention or diversion of business from his rivals appear discredited and repudiated today."

and later, at 160:

"The key decisions confirm that competitive 'injury' in seller-line cases, in the absence of predatory motivation, depends on the substantial impact on competition of the challenged price variations."[20]

*See also Anhaeuser-Busch v. FTC, supra,* 289 F2d at 840.

---

[19] *See* Table C on p 107, above.

[20] As also stated by Rowe, *supra,* n.11, at 162-163 (1962):

"Whatever may be the precise point at which vigorous price maneuvers become monopolistic abuses, it is *not* reached when important sellers with substantial resources battle for supremacy in the market—where inevitably one must gain business at the other's expense, who in turn must then lower his price or improve his product for the benefit of the public. Rather, substantial and permanent dislocations in the market due to a monopolistic or dominant seller's discriminatory pricing tactics are more appropriate criteria of detriment to competition at the seller level."

*See also* Note, *Competitive Injury Under the Robinson-Patman Act,* 74 Harv L Rev 1597, 1605 (1961).

Plaintiff also cites Rowe, *supra* at 161, as stating that "key indicia to *confirm* the existence of * * * competitive impairment" are:

"(a) Monopoly or overpowering position of the seller in wider markets.

"(b) Aggressive objectives toward smaller and weaker rivals.

"(c) Deep, sustained undercutting of rivals' prices, or elimination of an *established* price spread between a 'premium' and a lesser product.

"(d) Persistent sales below the seller's 'cost.'

"(e) Actual or impending demise of a seller's sole rival in a particular market." (Emphasis in original)

Plaintiff says that proof of "any one of these factors" may be sufficient and contends that the evidence in this case satisfies the requirements of "factors" (a), (c) and (e). Thus, plaintiff contends: (1) that plaintiff would have been put out of business but for loans from his parent company; (2) that the evidence shows defendants' "sustained undercutting of plaintiff's prices at levels substantially and consistently below defendants' own prices in the Bend area"; and (3) that as a result of price discrimination defendants have achieved "dominance in the local ready-mix industry" and that "plaintiff alone stands in the way of a monopoly by defendants in the Redmond and Madras market areas."

We do not agree that proof of any one of these "factors" is necessarily sufficient to prove a substantial impairment of competition. The fact that a competitor may be forced out of business is not, in and of itself, sufficient to establish a violation of the statute, particularly where, as in this case, there was evidence that plaintiff's financial problems were due, in large part at least, to its inability to compete with defendants in terms of service and modern equipment. As stated in *Pac. Eng. & Prod. Co. of Nev. v. Kerr-McGee Corp.,* 551 F2d 790, 795 (10th Cir 1977):

"In a two-firm industry, the exclusion of one firm necessarily results in a monopoly. That does not mean

the survivor necessarily violates the antitrust laws. * * * [Citing cases]"

As for defendants' "undercutting" of plaintiff's prices, we have already found, as previously stated, that defendants' "undercutting" of plaintiff's prices were neither "deep" nor "sustained." It follows that plaintiff's case on this critical issue must rest upon its contention that as a result of its price discrimination defendants have achieved "dominance [i.e., a "monopoly or overpowering position"] in the local ready-mix industry."

This contention, in turn, rests upon plaintiff's contention that the proper "market area" for use in consideration of the evidence in this case is not the "Redmond area," but the "Redmond-Madras" area. Thus, plaintiff says that:

"Defendants have sold from 73 to 82 percent of the total ready-mix produced by these parties, and within the Redmond-Madras area their share of the market has increased from about 15 percent when plaintiff started business to almost 60 percent immediately before trial."

Defendants contend, on the contrary, that the appropriate and proper market area under the evidence in this case is the Redmond area alone, not the Redmond-Madras area, and that in the Redmond market area plaintiff has been able to hold 70 percent of the ready-mix market. As previously stated, this was also the finding by the trial court.[21]

■ Based upon our examination of the evidence we also find that the Redmond market area is the appropriate and proper area for consideration in determining whether defendants have achieved a "monopoly or overpowering position." Plaintiff's charge of price

---

[21]The trial court, in its memorandum opinion, stated that:

"It appears to this Court that the ready-mix market in the Redmond area has stabilized. The equipment and know how of the plaintiffs has improved—they have been able to hold 70% of the market. Purdy and Johnnie are intelligent and personable individuals. There is no reason why the fortunes of the plaintiffs should not continue to improve."

discrimination was based upon defendants' price list for customers in the Redmond area. There was evidence that the area in which that price list was used was the area extending from the Deschutes Junction on the south to the Deschutes-Jefferson county line on the north. That area included Redmond, but did not include Madras, located in Jefferson County further north of that county line. There was also evidence that defendants did not have a separate price list for Jefferson County, including Madras, and that there was no difference between defendants' Bend and Madras price lists. Although plaintiff contends that defendants also discriminated in prices in the Madras area, we find no substantial evidence, other than bid sales, to support that contention.

The issue to be decided is the effect of defendant's price discrimination on competition. In deciding that issue we believe it proper to give at least primary consideration to the effect upon competition in the market area in which the price discrimination was practiced. That area, according to the preponderance of the evidence, was the Redmond market area, as previously defined.

It follows, in our opinion, that because, as we also find from the evidence, plaintiff has been able to maintain 70 percent of the market in that area, despite defendants' lower price lists for that area, plaintiff has failed to prove that defendants have achieved a "monopoly or overpowering position" in that market area.[22] It also follows, for reasons previously stated, that plaintiff has failed to prove that

---

[22] We have not overlooked plaintiff's contention that this 70 percent figure was erroneously computed in that it included plaintiff's sales volume in all areas, but limited defendants' sales to the Redmond area. We find from our review of the record, however, that the sales figures for both parties represent sales in the Redmond area according to what we consider to be a preponderance of the evidence. In any event, in order to establish its contention that defendants had a "monopoly or overpowering position" plaintiff had the burden of proving the sales volume for both parties in the Redmond area. Plaintiff failed to sustain that burden of proof.

defendants' price discrimination resulted in a substantial impairment of competition, as required to establish its charges against these defendants.

■ The Oregon Anti-Price Discrimination Law was not intended to insulate any business operation from competition. Indeed, one purpose of such statutes is to foster healthy competition in the interests of the public. In our judgment, the fact that prices for ready-mix concrete in the Redmond area have been generally lower than the Bend area indicates that there is healthy competition in the Redmond area and not, as contended by plaintiff, that competition has been "injured."

For all of these reasons, the judgment of the trial court is affirmed.