Argued and submitted May 24, affirmed on appeal and on cross-appeal September 6, reconsideration denied November 17, 1989, petition for review allowed February 22, 1990 (309 Or 333)

YAMAHA STORE OF BEND, OREGON, INC.,
dba "The Yamaha Store,"
*Respondent - Cross-Appellant,*

*v.*

YAMAHA MOTOR CORPORATION, U.S.A.,
*Appellant - Cross-Respondent.*

(32901; CA A44218)

779 P2d 1061

Peter C. Richter, Portland, argued the cause for appellant - cross-respondent. With him on the briefs were Jeffrey D. Austin and Miller, Nash, Wiener, Hager & Carlsen, Portland.

Ronald L. Marceau, Bend, argued the cause for respondent - cross-appellant. With him on the briefs were David F. Berger and Marceau, Karnopp, Petersen, Noteboom & Hubel, Bend.

Before Graber, Presiding Judge, and Joseph, Chief Judge,* and Riggs, Judge.

GRABER, P. J.

* Joseph, C. J., *vice* Edmonds, J.

## GRABER, P. J.

Defendant Yamaha Motor Corporation, U.S.A., appeals from a judgment for plaintiff The Yamaha Store of Bend, its former franchisee, in this action under ORS 646.010 to ORS 646.180, the Anti-Price Discrimination Law (the Act). Plaintiff cross-appeals from the trial court's refusal to award it "costs of suit" in addition to statutory costs under ORCP 68. We affirm on the appeal and on the cross-appeal.

Because the jury found for plaintiff, we state the facts most favorably to its position. *Forster v. Kawasaki Motors Corp.,* 73 Or App 439, 443, 698 P2d 1001, *rev den* 299 Or 663 (1985).[1] Defendant is the United States distributor of Yamaha motorcycles, snowmobiles, and other products. From 1978 through early 1983, plaintiff was the Yamaha dealer in Bend. Defendant published a list of the prices that it charged dealers for its motorcycles and sold them at the prices on that list; the prices were the same for all dealers.

In June, 1982, the largest Yamaha dealer in the Portland metropolitan area went out of business. Defendant repossessed about 550 new 1980, 1981, and 1982 model motorcycles. Sales had been poor in both 1980 and 1981, and consequently many other Yamaha dealers, including plaintiff, also had an inventory of unsold motorcycles. In July, 1982, Beaverton Honda agreed with defendant to become a Yamaha dealer and changed its name to Beaverton Honda-Yamaha (Beaverton). Defendant sold Beaverton the repossessed motorcycles at prices significantly below its regular dealer prices. It did not offer plaintiff or any dealer other than Beaverton an opportunity to purchase those motorcycles.

Beaverton then held a sale in which it offered the repossessed motorcycles at retail at prices that were close to plaintiff's and other dealers' wholesale cost for the same models. It was able to do so because of the low prices at which it had obtained them and because of the advertising subsidies that defendant provided. Beaverton advertised the sale extensively in Portland newspapers and on Portland television stations, all of which were readily available in the Bend area. As a result, plaintiff, in order to sell its motorcycles, had to reduce

---

[1] Defendant failed to follow this basic principle of appellate review in preparing the statement of facts in its brief.

its prices below what it had previously charged and to sell some at or below its actual cost.

Plaintiff sued defendant for damages on the ground that the sale to Beaverton had violated the Act. The jury awarded plaintiff damages of $2,166.56 for the difference in the prices that it and Beaverton had paid for identical 1982 models and $23,691.45 for the reduction in value of plaintiff's inventory of 1980 and 1981 models that resulted from Beaverton's ability to sell them to the public at reduced prices.[2] The court trebled the award pursuant to ORS 646.140 and ORS 646.150 and entered judgment for plaintiff for $77,574.03. It also entered judgment for defendant for $29,391, the conceded damages on its counterclaim for parts that plaintiff had received but not paid for. The result was a net recovery for plaintiff of $48,183.03. The court thereafter awarded plaintiff attorney fees of $90,000 and statutory costs and disbursements of $620.18. It denied plaintiff's motion for an additional $14,680.43 as "costs of suit."

Plaintiff's claims arise under ORS 646.040(1), which provides, in pertinent part:[3]

"It is unlawful for any person engaged in commerce, * * * either directly or indirectly, to discriminate in price between different purchasers of commodities, * * * of like grade and quality or to discriminate in price between different sections, communities or cities * * * of this state, where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them."

In order to prevail, plaintiff must prove that the effect of the difference in the prices at which defendant sold to it and to Beaverton "may be substantially to lessen competition." In order to prove that effect, plaintiff must show that it and

---

[2] The jury also awarded plaintiff $25,858.01 on an alternative breach of contract claim. Because we affirm the award on the price discrimination claim, which supports a greater judgment than does the breach of contract claim, we do not discuss the other claim any further. *See Morgan v. Turley,* 95 Or App 316, 768 P2d 933, *on reconsideration,* 97 Or App 487, 776 P2d 586 (1989).

[3] ORS 646.040(2) establishes several defenses to a price discrimination claim. None is relevant to this appeal.

Beaverton competed in the same market.[4] *See Redmond Ready-Mix v. Coats,* 283 Or 101, 120-121, 582 P2d 1340 (1978).[5]

■　　In its first assignment of error, defendant argues that the trial court erred when it denied defendant's motion for a directed verdict on the price discrimination claim, because there is no evidence from which the jury could conclude that Beaverton and plaintiff competed in the same market. It cites testimony that plaintiff's market was the three counties around Bend and that Beaverton's market was Washington and Multnomah counties. It recognizes that Beaverton made several sales to customers who lived in the Bend area, but it treats those sales as isolated incidents that occurred on the fringes of the two dealers' market areas, not as proof of direct competition between them. *See Eastern Auto Distrib. v. Peugeot Motors of America,* 795 F2d 329, 335-336 (4th Cir 1986).[6]

　　Defendant's arguments do not adequately consider the effect of Beaverton's advertising campaign on plaintiff's

---

[4] Plaintiff argues that the statutory prohibition of price discrimination "between different sections, communities or cities or portions thereof * * * in this state" establishes the entire state as the relevant market as a matter of law. That argument ignores the requirement that the effect of the discrimination "may be substantially to lessen competition." Without that effect on competition, there is no violation of the Act, and there can be an effect on competition only if there is some common market in which the sellers *in fact* compete. *If* two entities compete, then their being in different communities is not a permissible basis for price discrimination between them.

[5] *Redmond Ready-Mix, Inc. v. Coats, supra,* was a "primary line" case, in which both the plaintiff and the defendant were sellers competing in the same line of commerce. This is a "secondary line" case, in which the recipients of the discriminatorily priced goods are engaged in the same line of commerce but the discriminating seller is not. *See* 283 Or at 115 n 17. In either situation, the plaintiff must show that the discrimination has a substantial effect on competition in some identifiable market in which it competes. *See Lupia v. Stella D'Oro Biscuit Co., Inc.,* 586 F2d 1163, 1170, (7th Cir 1978), *cert den* 440 US 982 (1979); *NW Medical Lab. v. Blue Cross and Blue Shield,* 97 Or App 74, 775 P2d 863, *rev allowed* 308 Or 465 (1989), considered an allegedly unreasonable restraint on trade, under ORS 646.725, *within* a given geographic area. 97 Or App at 80 n 6. Because *Blue Cross* did not involve the theory of geographic restraint of trade or price discrimination, and because we reviewed *de novo,* 97 Or App at 76, we did not decide what kind of evidence would be sufficient to submit to a jury to prove competition in the plaintiff's geographic market.

[6] Because the Act is based in large part on the federal Robinson-Patman Act, cases that construe the federal act are relevant for construction of the Oregon Act.

competitive position.[7] There was evidence from which the jury could have found that the Portland newspapers and television stations were major factors in the Bend market, that people who wished to buy relatively expensive items like motorcycles would shop in the Portland metropolitan area, and that potential customers in Bend knew of the Beaverton prices and expected plaintiff to meet them.

The Bend Honda motorcycle dealer testified that his customers often brought advertisements from the *Oregonian* with them and that he began keeping those advertisements in his store to show customers, that his major competition was from Portland-area Honda dealers, and that Portland pricing directly affected his pricing. He explained that "I don't lose business because I get aggressive enough to get the business in Bend. That is why I don't lose business to Portland." An economist testified that heavy advertising of lower prices by a favored retailer was likely to produce negative customer relations for plaintiff and to depress the value of plaintiff's inventory. One of plaintiff's owners testified that Beaverton's advertising produced competitive pressures that forced plaintiff to lower its prices. Plaintiff's general manager testified that potential motorcycle purchasers in Bend were aware of Beaverton's prices and that plaintiff had to compete with them.

There is no evidence that plaintiff competed with Beaverton in the Portland metropolitan area, which was Beaverton's primary market. It was not necessary to show such competition, however. It was sufficient to show that Beaverton competed with plaintiff in *plaintiff's* primary market, and there was evidence from which the jury could conclude that it did. The trial court did not err in denying the motion for a directed verdict.

The jury awarded plaintiff two items of damages. One was measured by the difference in the prices that defendant charged it and Beaverton for 1982 model motorcycles; the

---

[7] None of the federal cases on which defendant relies to determine the relevant market considers the effect of advertising on that determination. There is significant evidence in this record that, even if Beaverton made few sales in plaintiff's market, its advertising of the lower prices that defendant's discriminatory price made possible exerted considerable competitive pressures on plaintiff that plaintiff had difficulty meeting.

other was measured by the devaluation of plaintiff's inventory of 1980 and 1981 models that resulted from the lower prices at which plaintiff had to sell them as a result of Beaverton's advertising. Plaintiff alleged that the devaluation resulted from the reduced prices that Beaverton paid for identical motorcyles, which made possible its lower advertised prices. The damages for the 1982 models are "presumed" damages under ORS 646.160,[8] and defendant does not challenge the propriety of that award. In its second assignment of error, it contends that the trial court erred by submitting the issue of the devaluation of the 1980 and 1981 inventory to the jury.

■      Defendant first argues that the trial court should not have allowed plaintiff to amend its complaint during trial. Plaintiff had difficulty articulating a *theory* of damages related to the 1980 and 1981 inventory, and it did not settle on one until well into the trial. However, plaintiff had less difficulty developing the *facts* of those damages. It prepared a list that showed each motorcycle in its inventory, compared its cost for that motorcycle to what Beaverton paid for a comparable machine, adjusted for items that defendant does not contest on appeal, and determined the total difference. It provided that list, which is the basis of its claim for devaluation of inventory, to defendant several months before trial. The trial court did not err in permitting plaintiff to amend its complaint. ORCP 23B.

■      Defendant argues, in addition, that devaluation of inventory is not a proper measure of damages in this case, because plaintiff in fact sold all of the motorcycles in its inventory, most for prices above its actual costs. That fact is not inconsistent with finding that Beaverton's advertising

---

[8] ORS 646.160 provides: ·

"In any proceedings instituted or action brought in pursuance of the provisions of ORS 646.140 or 646.150, the plaintiff, upon proof that the plaintiff has been unlawfully discriminated against by the defendant, shall conclusively be presumed to have sustained damages equal to the monetary amount or equivalent of the unlawful discrimination; and, in addition thereto, may establish such further damages, if any, as the plaintiff may have sustained as a result of the discrimination."

The trial court submitted the presumed damages theory to the jury on the 1982 models only. Plaintiff did not ask the court to instruct the jury on that theory for the 1980 and 1981 model years, apparently because federal cases require that the allegedly discriminatory sales be reasonably contemporaneous. Plaintiff had bought its stock of 1980 and 1981 models in those years, while Beaverton purchased its stock in 1982.

reduced the value of plaintiff's 1980 and 1981 models. The evidence that plaintiff received less than its usual markup for those motorcycles because of the competition from Beaverton is evidence that the competition reduced the value of the inventory. A jury could find that the reduction in value was equal to the difference between the prices that plaintiff and Beaverton paid. Under ORS 646.160, there is a conclusive presumption that plaintiff suffered damages equal to the amount of the price discrimination. It is consistent with that provision to permit the jury to apply the same measure of damages to the discrimination on the older models. The trial court did not err by submitting the devaluation of inventory theory to the jury.

■ Defendant's final assignment is that the court's award of attorney fees was excessive. It argues that plaintiff sought fees for time spent on issues on which it was unsuccessful and that the amount of the award is disproportionate to the results of the case, in part because it is higher than the judgment for plaintiff. The court adjusted the fee award so that it reflected only the time that plaintiff spent on the issues on which it prevailed. There is nothing inherently improper in awarding attorney fees that are greater than the judgment, *see, e.g., Campbell v. Karb,* 303 Or 592, 740 P2d 750 (1987), and the court did not abuse its discretion in doing so in this case.

■ On cross-appeal, plaintiff argues that the trial court erred when it failed to award it what it calls "costs of suit" under ORS 646.140.[9] It argues that that statute provides for the award of costs beyond the statutory costs and disbursements available to a prevailing party as a matter of course. ORCP 68B.[10] "Costs * * * are not recoverable in the absence of a statute or contractual provision authorizing the award. * * * Any entitlement to costs must be found in, *and is limited by,* statute." *Compton v. Weyerhaeuser,* 302 Or 366, 367, 730 P2d 540 (1986). (Emphasis supplied.) The issue, therefore, is whether the legislature intended "costs of suit" in ORS

---

[9] ORS 646.140 authorizes a successful plaintiff "to recover three-fold the damages sustained by the plaintiff, and the costs of suit and a reasonable attorney fee at trial and on appeal."

[10] Among the costs that plaintiff seeks to recover under this heading are fees for expert witnesses, consulting services, court reporters, and paralegal time. It is not clear why plaintiff did not include the paralegal time in its request for attorney fees.

646.140 to be anything different from the costs and disbursements that other statutes already provided. We see no reason to hold that it did.

The legislature knows how to authorize the recovery of expenses in addition to statutory costs and disbursements when it wants to. *See, e.g.,* ORS 166.725(7) ("costs of investigation and litigation, reasonably incurred"); ORS 646.780(1)(a) ("costs of suit including necessary reasonable investigative costs and reasonable experts' fees"). There is nothing in the Oregon legislative background that supports plaintiff's position. When the legislature adopted the Act in 1937, it provided equitable remedies to victims of illegal discrimination. Or Laws 1937, ch 215, § 8(a). It authorized plaintiffs to recover costs and attorney fees in the same section. In that context, the legislature's use of the phrase "costs of suit" to describe what a successful plaintiff could recover simply reflected its awareness of the distinction between an action at law and a suit in equity. There is no suggestion that it intended to authorize plaintiffs to recover costs in addition to those that were usually available.

Affirmed on appeal and cross-appeal.