Argued December 6, 1977, opinion affirmed August 1, 1978

# TOP SERVICE BODY SHOP, INC.,
## *Appellant,*
### *v.*
# ALLSTATE INSURANCE COMPANY, *Respondent.*
## (TC 76-547, SC 25142)
### 582 P2d 1365

[ 202-a ]

Ronald L. Gould, Coos Bay, argued the cause for appellant. With him on the briefs were Orrin R. Ormsbee, Craig O. West, McNutt, Gant & Ormsbee.

Alan H. Silberman, Chicago, Illinois, argued the cause for respondent. With him on the brief were Sonnenschein, Carlin, Nath & Rosenthal, Chicago, Ill., and Wayne Hilliard, Dezendorf, Spears, Lubersky & Campbell, Portland.

LINDE, J.

## LINDE, J.

Plaintiff, the operator of an automobile body repair shop in Coos Bay, Oregon, sued defendant insurance company for general and punitive damages for injuries alleged to result from defendant's wrongful practices in directing insurance claimants to have repairs made at body shops other than plaintiff's. The complaint pleaded causes of action grounded in two theories: First, tortious interference with plaintiff's business, and second, inducement of other body shops to accord defendant discriminatory price advantages prohibited by statute. On the second claim plaintiff also requested an injunction. Defendant answered by general denials and an affirmative defense to the tort claim asserting a privilege of acting in its own legitimate financial interests. Plaintiff replied that defendant's methods and intent took its actions beyond any such privilege.

The trial resulted in jury verdicts for plaintiff in amounts of $20,000 compensatory and $250,000 punitive damages on the tort claim and $45,000 in treble damages on the price discrimination claim. On defendant's motion, the trial court entered judgments notwithstanding the verdicts on both causes of action, primarily for failure of proof. The court also allowed defendant's alternative motion for a new trial pursuant to ORS 18.140(3).[1] On appeal, plaintiff assigns as error the rulings on these motions and also two rulings excluding evidence offered by it during the trial. We affirm.

---

[1] ORS 18.140(3) provides:

A motion in the alternative for a new trial may be joined with a motion for judgment notwithstanding the verdict, and unless so joined shall, in the event that a motion for judgment notwithstanding the verdict is filed, be deemed waived. When both motions are filed, the motion for judgment notwithstanding the verdict shall have precedence over the motion for a new trial, and if granted the court shall, nevertheless, rule on the motion for a new trial and assign such reasons therefor as would apply had the motion for judgment notwithstanding the verdict been denied, and shall make and file an order in accordance with said ruling.

## I. *The claim of tortious interference.*

Although other jurisdictions have decided numerous claims of tortious interference with business relations, this court has had few occasions to consider the elements of this tort. See *Wampler v. Palmerton,* 250 Or 65, 439 P2d 601 (1968), and cases *id.* at 73 n.8; *American Sanitary Service, Inc. v. Walker,* 276 Or 389, 554 P2d 1010 (1976); and *Comini v. Union Oil Co.,* 277 Or 753, 562 P2d 175 (1977). We therefore begin with a brief description of the problem.

Tort claims for wrongful interference with the economic relationships of another have an ancient lineage. Their history has been traced from interference with members of another's household in Roman law or with his tenants in English law, with his workmen after the 1349 Ordinance of Labourers, with prospective workmen or customers, with existing contracts for personal services, *Lumley v. Gye,* 118 Eng Rep 749 (QB 1853), and with contracts generally, *Temperton v. Russell* [1893] 1 QB 715 (CA), to contemporary forms not dependent on the existence of a contract. See *Wampler v. Palmerton, supra, citing* Sayre, *Inducing Breach of Contract,* 36 Harv L Rev 663 (1923); Carpenter, *Interference with Contract Relations,* 41 Harv L. Rev 728 (1928) (also published in 7 Or L Rev 181, 301 (1928)). Despite these antecedents, protection in tort against interference with business relations has been described as largely a twentieth-century development. Prosser, Handbook of the Law of Torts § 129, at 927 (4th ed 1971). A recent study regards the generalized concept of "tortious interference" as "[o]ne of the most fluid and rapidly growing tort theories," comparable to products liability, and promising to become the predominant remedy for a multitude of business wrongs. Estes, *Expanding Horizons in the Law of Torts—Tortious Interference,* 23 Drake L Rev 341, 341, 363 (1974).[2]

[2]Comparable developments in other common-law countries are described in Fleming, The Law of Torts 599-631 (4th ed 1971); Heydon, *The*

■ Either the pursuit of an improper objective of harming plaintiff or the use of wrongful means that in fact cause injury to plaintiff's contractual or business relationships may give rise to a tort claim for those injuries. Prosser, Handbook of the Law of Torts § 130 at 952 (4th ed 1971). However, efforts to consolidate both recognized and unsettled lines of development into a general theory of "tortious interference" have brought to the surface the difficulties of defining the elements of so general a tort without sweeping within its terms a wide variety of socially very different conduct.[3] These difficulties are shown by the changing treatment of the subject in the American Law Institute's *Restatement of the Law of Torts.* The main problem is what weight to give to the defendant's objective in interfering with plaintiff's contract or with plaintiff's prospective business relations. If the focus in defining the tort is on defendant's wrongful motive or use of wrongful means, this element will likely be a necessary part of plaintiff's case. If the tort is defined primarily as an invasion of plaintiff's protected interests, defendant's reasons are likely to

*Future of Economics Torts,* 12 U W Aust L Rev 1 (1975); and Stevens, *Interference with Economic Relations—Some Aspects of the Turmoil in the Intentional Torts,* 12 Osgoode Hall L J 595 (1974).

[3] During one period of history, the tort of interference with contracts was a main legal weapon against labor organization. *See, e.g., Hitchman Coal & Coke Co. v. Mitchell,* 245 US 229 (1917) (injunction); *Vegelahn v. Guntner,* 167 Mass 92, 44 NE 1077 (1896); Prosser, Handbook of the Law of Torts § 129 at 946-947 (4th ed 1971). In the contemporary context, a broad generalization similarly could make prima facie torts of otherwise lawful activities designed to persuade others to stop smoking cigarettes or eating certain foods, or using certain pesticides, or doing business in South Africa, or buying grapes or other products, leaving the defense in each case to a showing of privilege.

Another problem is that an overbroad generalization reaches the complex questions of liability for negligent conduct causing business injuries to a chain of different parties. *See* Harper & James, The Law of Torts § 6.10 (1956); Note, *Negligent Interference with Economic Expectancy: The Case for Recovery,* 16 Stan L Rev 664 (1964).

be treated as questions of justification or privilege.[4] Section 766 of the first *Restatement of Torts* read:

> Except as stated in Section 698, one who, without a privilege to do so, induces or otherwise purposely causes a third person not to
>
> (a) perform a contract with another, or
> (b) enter into or continue a business relation with another
>
> is liable to the other for the harm caused thereby.[5]

The term "purposely" meant that a defendant must not only have expected, or "intended," his conduct to interfere with plaintiff's contract or business relationship but that this interference must have been at least one purpose of defendant's act.[6] Reasons that would excuse such an interference were then stated as "privileges" in sections 767-774.

In preparing the *Restatement (Second) of Torts* in 1969, the then Reporter, Dean William Prosser, proposed to change "purposely" to "intentionally" with respect to any interference with an existing contract that was not justified by a privilege. He would have retained "purposely" with respect to interference with

---

[4] This approach is chosen in Prosser, *supra* note 3, § 129, at 942-946, § 130, at 953-965; Carpenter, *Interference with Contractual Relations,* 41 Harv L Rev 728 (1928); and Harper, *Interference with Contractual Relations,* 47 Nw U L Rev 873, 881 (1953).

[5] Restatement of Torts § 766 (1939).

[6]  *d. Induces or otherwise purposely causes* . . . . The rule stated in this Section applies to any purposeful causation whether by inducement or otherwise. The essential thing is the purpose to cause the result. If the actor does not have this purpose, his conduct does not subject him to liability under this rule even if it has the unintended effect of deterring the third person from dealing with the other. It is not necessary, however, that the purpose to cause the breach of contract or failure to deal be the actor's sole or paramount purpose. It is sufficient that he designs this result whether because he desires it as an end in itself or because he regards it as a necessary, even if regretable, means to some other end (see Comment *k*).

Restatement of Torts § 766, Comment *d* (1939).

future contractual relations.[7] However, the change to liability based simply on unprivileged intent was not accepted even with respect to inducing or causing breaches of existing contracts. *See* American Law Institute, Proceedings of the 46th Annual Meeting 179-205 (1970). The result was a revision by the succeeding Reporter, Dean John W. Wade, of the *Restatement* chapter dealing with the tort of interference with existing or prospective contracts or, as the Reporter described it, "interference with advantageous economic relations," which proposed significant changes in the analysis. *See* Restatement (Second) of Torts § 766 (Tent. Draft No. 23, 1977). As the *Restatement* now stands, such interference would give rise to liability if it is both intentional and affirmatively improper (replacing reliance on lack of "privilege" in the definition of the tort), and a purpose to harm the injured party would be one factor making the interference improper. Restatement (Second) of Torts §§ 766-767 (Tent. Draft No. 23, 1977).[8]

---

[7]Restatement (Second) of Torts § 766A, at 50 (Tent. Draft No. 14, 1969). The accompanying note stated:

"Purposely" appears to be called for here. There seem to be no cases even suggesting liability when the defendant acts for his own purposes, with knowledge that his conduct is certain to cause a third person to avoid prospective relations with the plaintiff.

*See also Bliss v. Southern Pacific Co.,* 212 Or 634, 645, 321 P2d 324 (1958).

[8]
§ 766. INTENTIONAL INTERFERENCE WITH PERFORMANCE OF CONTRACT BY THIRD PERSON

ONE WHO INTENTIONALLY AND IMPROPERLY INTERFERES WITH THE PERFORMANCE OF A CONTRACT (EXCEPT A CONTRACT TO MARRY) BETWEEN ANOTHER AND A THIRD PERSON BY INDUCING OR OTHERWISE CAUSING THE THIRD PERSON NOT TO PERFORM THE CONTRACT, IS SUBJECT TO LIABILITY TO THE OTHER FOR THE PECUNIARY LOSS RESULTING TO THE OTHER FROM THE THIRD PERSON'S FAILURE TO PERFORM THE CONTRACT.

. . . .

§ 766B. INTENTIONAL INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATION.

The evolution of this "restatement" of the tort is significant here because it corresponds to a similar division in the recent decisions in this state. In *Wampler v. Palmerton, supra,* intentional interference with an existing contract was assumed to be prima facie tortious, unless it was justified or privileged as promoting some legitimate interest. In that case, corporate officers were held to have such a privilege in advising the corporation. 250 Or at 73-78.[9] A similar approach was followed in *North Pac. Lumber Co. v. Moore,* 275 Or 359, 551 P2d 431 (1976), but the

ONE WHO INTENTIONALLY AND IMPROPERLY INTERFERES WITH ANOTHER'S PROSPECTIVE CONTRACTUAL RELATION (EXCEPT A CONTRACT TO MARRY) IS SUBJECT TO LIABILITY TO THE OTHER FOR THE PECUNIARY HARM RESULTING FROM LOSS OF THE BENEFITS OF THE RELATION WHEN THE INTERFERENCE CONSISTS OF

(a) INDUCING OR OTHERWISE CAUSING A THIRD PERSON NOT TO ENTER INTO OR CONTINUE THE PROSPECTIVE RELATION OR

(b) PREVENTING THE OTHER FROM ACQUIRING OR CONTINUING THE PROSPECTIVE RELATION.

See also Comment d to the latter section:

d. Intent and purpose. The intent required for this Section is that defined in § 8A. The interference with the other's prospective contractual relation is intentional if the actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action. (See § 766, Comment j).

The interference, however, must also be improper. The factors to be considered in determining whether an interference is improper are stated in § 767. One of them is the actor's motive and another is the interest sought to be advanced by him. Together these factors mean that the actor's purpose is of substantial significance. If he had no desire to effectuate the interference by his action but knew that it would be a mere incidental result of conduct he was engaging in for another purpose, the interference may be found to be not improper. Other factors come into play here, however, particularly the nature of the actor's conduct. If the means used are innately wrongful, predatory in character, a purpose to produce the interference may not be necessary. On the other hand, if the sole purpose of the actor is to vent his ill will, the interference may be improper although the means are less blameworthy. For a more complete treatment see § 767, especially Comment d.

[9]Similarly, in *Comini v. Union Oil Co.,* 277 Or 753, 562 P2d 175 (1977), an oil company's legitimate interest in the management of its outlets was said to give it a privilege to disapprove a proposed sale of a distributorship.

court held that it was plaintiff's burden to prove both that defendant intentionally interfered with plaintiff's prospective sales and that defendant had no privilege to do so. In that case, defendant was plaintiff's competitor, and the court assumed that its privilege as a competitor might be overcome by proof that it had made use of customer and market information obtained by hiring one of plaintiff's employees. The effect is that the propriety of defendant's objective or motive is really a part of plaintiff's case rather than an affirmative defense of "privilege." However, even when defendant's objectives are not improper, for instance the pursuit of competition or other legitimate interests, defendant may still be liable for using improper means to achieve these objectives.

Meanwhile, the decision in *Nees v. Hocks,* 272 Or 210, 536 P2d 512 (1975), rejected the concept that every intentional infliction of harm is prima facie a tort unless justified. Finding that this concept was no longer needed to escape the rigidity of the common-law forms of pleading, the court concluded that it created as many difficulties as it solved.[10] However, the court found that the plaintiff had effectively pleaded and proved that her discharge by defendant was tortious by reason of an improper motive.

We conclude that the approach of *Nees v.Hocks* is equally appropriate to claims of tort liability for intentional interference with contractual or other economic relations. In summary, such a claim is made out when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself. Defendant's liability may arise from improper motives or from the use of improper means. They may be wrongful by reason of a statute or

---

[10] As soon as "prima facie tort" gained an independent status the controversy began as to its elements. Are special damages required? Is "malice" required? Brown, *The Rise and Threatened Demise of the Prima Facie Tort Principle,* 54 Northw U L Rev 563 (1959). In the present case counsel have some disagreement whether plaintiff must prove malicious conduct by defendants. 272 Or at 214.

other regulation, or a recognized rule of common law,[11] or perhaps an established standard of a trade or profession. No question of privilege arises unless the interference would be wrongful but for the privilege; it becomes an issue only if the acts charged would be tortious on the part of an unprivileged defendant. Even a recognized privilege may be overcome when the means used by defendant are not justified by the reason for recognizing the privilege. *See Sloan v. Journal Publishing Co.,* 213 Or 324, 358-359, 324 P2d 449 (1958). To this extent we agree with the analysis of the second *Restatement.*[12]

■ In the present case, Top Service pleaded both improper motives and improper means of interference. It alleged that Allstate sought to and did induce Top Service's patrons not to have Top Service repair their automobiles, making false statements about the quality of plaintiff's workmanship and threats about withdrawing insurance coverage or subjecting the settlement of claims to possible arbitration. It also alleged that this was done "with the sole design of injuring Plaintiff and destroying his business," and in an endeavor to "compel Plaintiff to abandon the same." If

[11] Commonly included among improper means are violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood. *See* Fleming, *supra* note 2, at 612-614; Prosser, *supra* note 3, § 129, at 936-937; Restatement (Second) of Torts § 766, Comments *j, k,* § 767, Comment *c* (Tent. Draft No. 23, 1977). As the latter comment points out, in a claim of improper interference with plaintiff's contractual relations, it is not necessary to prove all the elements of liability for another tort if those elements that pertain to the defendant's conduct are present. For instance, fraudulent misrepresentations made to a third party are improper means of interference with plaintiff's contractual relations whether or not the third party can show reliance injurious to himself. *See also* Estes, *Expanding Horizons in the Law of Torts—Tortious Interference,* 23 Drake L Rev 341, 348 (1974).

[12] We need not in this case discuss the "factors" approach of section 767, cited by plaintiff, which poses unresolved difficulties with respect to pleading, proof, and the function of court and jury. *See* Restatement (Second) of Torts § 767, Comments *j, k, l* (Tent. Draft No. 23, 1977). For other difficulties inherent in "balancing" as an approach to individual cases rather than to characteristic types of relationship, see the thorough opinion in *Continental Research, Inc. v. Cruttenden, Podesta & Miller,* 222 F Supp 190, 216-217 (D Minn 1963).

proved, along with damages and causation, these allegations satisfy the elements of the tort we have reviewed above.

Defendant contended successfully in the trial court that the evidence, taken most favorably to plaintiff, was insufficient to support a verdict for plaintiff. Judge Warden's order recited two grounds for allowing the motion for judgment n.o.v. on the first cause of action. The first was that "there was no evidence that defendant's conduct was the result of a specific intent directed at the plaintiff or that its purpose was to interfere with the plaintiff, as such." Any impact on plaintiff of defendant's dealings with its insurance claimants was described as "incidental and collateral." The second ground was that defendant acted only within its legal privilege of dealing with its insurance claimants in pursuit of its own lawful business interests.

■   As to the first issue, Top Service does not really argue that there was direct evidence to show that Allstate had acted with the destructive design quoted above.[13] It claims that even without direct evidence of a specific purpose of defendant to destroy Top Service's business, the jury could have inferred such a purpose from evidence of defendant's conduct in directing customers to other body repair shops. But the record will not support an inference that Allstate had any design or purpose to inflict injury on Top Service as such, even short of the "sole design" to put Top Service out of business that the complaint alleged.

Taken most favorably to plaintiff, as is proper after a verdict for plaintiff, the evidence showed that Allstate has a practice of designating certain repair shops in the locality as "competitive shops" to which it prefers to send insurance claimants for whose repairs Allstate is obligated; that Top Service at one time was a "drive-in" shop for Allstate, where claimants would

---

[13] Top Service does argue that such evidence was improperly excluded, an issue examined below.

be directed for an estimate by an Allstate insurance adjuster; that after a dispute Top Service's owner decided that it would not continue as a drive-in shop for Allstate; and that thereafter Allstate adjusters would actively discourage claimants under its insurance policies from taking work to be paid for by Allstate to Top Service, sending them instead to other shops on its preferred list. As specific bases for an inference of destructive purpose, Top Service lists two occasions when Allstate adjusters disparaged the quality of Top Service's work (apart from its relative cost), although Allstate personnel had generally considered Top Service a high quality shop; Allstate's willingness to disappoint its own insured who preferred Top Service; one occasion when Allstate took its option to "total" a car, *i.e.* to pay off its value, when the insured wanted it repaired at Top Service; and finally Allstate's resort to "improper and unlawful means" to direct business away from Top Service to other shops. Without setting forth here the excerpts of the record cited by plaintiff, we agree with the trial court that these acts were wholly consistent with Allstate's pursuit of its own business purposes as it saw them and did not suffice to support an inference of the alleged improper purpose to injure Top Service. The court's ruling on this point was not error.

■ Plaintiff argues, however, that evidence that would support such an inference was improperly excluded. Several witnesses were called to testify to occasions, after the complaint in this case was filed, when Allstate discouraged their taking repair jobs to Top Service. In its brief, plaintiff represents that this evidence would have shown continued interference and disparagement by Allstate after Allstate was on notice, by virtue of the complaint, that Top Service regarded its conduct as wrongful and damaging to Top Service.[14] Such evidence of acts by a defendant similar

---

[14]The offered testimony is not before us, because the trial court refused to let plaintiffs make an offer of proof. That refusal is not assigned as error.

to those charged in the complaint is sometimes admissible. *See Union Central Life Ins. Co. v. Kerron,* 128 Or 70, 79, 264 P 453 (1928) (fraud), *quoted with approval in Carpenter v. Kraninger,* 225 Or 594, 601-602, 358 P2d 263 (1961) (fraud); *Peck v. Coos Bay Times Pub. Co.,* 122 Or 408, 422-423, 259 P 307 (1927) (libel). However, the statements described in plaintiff's brief appear to be cumulative instances of the same kind of dealings with Allstate's insurance claimants that the trial court, and we, have found insufficient for an inference that Allstate's motive and purpose was to drive Top Service out of business, as the complaint alleged.

■ More directly to this point, plaintiff offered the testimony of two witnesses to remarks made by William Erickson, a former claims adjuster for Allstate in Coos Bay who had become a claims supervisor for the company in Eugene. Donald Stover, claims manager for another insurance company, testified in an offer of proof to a conversation in November 1975 in which Erickson said that if Top Service continued with its lawsuit against Allstate, "they" would bring up matters documented in their files that would put Top Service out of business. Hugh Berger, son of Top Service's owner, similarly testified in an offer of proof that on a social visit to Erickson's home in December 1975 Erickson "was bragging about how much power he had with Allstate"; that Erickson "was talking about how he could close my dad's doors and he said, 'I'm going to get Donald Berger and I'm going to get him good.' " The trial court ruled that Erickson was not speaking within the scope of his employment with Allstate so as to except these statements from the hearsay rule as admissions by an agent.

■ In *Timber Access Industries Co. v. U. S. Plywood-Champion Papers, Inc.,* 263 Or 509, 503 P2d 482 (1972), this court compared the rule for the admissibility of an agent's admissions against his employer stated in *McCormick on Evidence* and in the Model

Code of Evidence,[15] which lets in the agent's statements concerning a matter within the scope of his employment even if the statement is made while acting outside that scope, with the older rule stated in *Hansen v. Oregon-Wash. R. & N. Co.,* 97 Or 190, 188 P 963 (1920), that such statements are admissible only if the agent is authorized to make them for his employer or if he makes them while "acting within the scope of his agency, and about the business of his principal, concerning such business." The court concluded in *Timber Access* that the agent, having been transferred, was not speaking within the scope of his agency, but that it was doubtful whether testimony to his statement would be admissible even under the broader modern rule. 263 Or at 515-518. In the present case, Erickson's comments while visiting with Stover and later with Berger were not made within the course of conducting Allstate's business. Assuming that they are nevertheless admissible by the more modern test, the first comments ascribed to Erickson in November related only to what "they," presumably meaning Allstate, might "bring up" if Top Service went forward with its lawsuit. Nothing in them related to Allstate's motives for directing claimants to body repair shops other than plaintiff's, which gave rise to the lawsuit in the first place. The remarks ascribed to Erickson by Hugh Berger were said to have been made a month after those to Stover, and they state future, not past, intentions on Erickson's part. Although the quoted words do not expressly mention Top Service's lawsuit against Allstate, we think that in the context of dates this offer of proof was too brief and incomplete to show that it related back to a hostile motive preceding the impending litigation to which Erickson had referred previously. While Hugh Berger's testimony might

---

[15] Evidence of a hearsay declaration is admissible against a party to the action if the judge finds that

(a) the declaration concerned a matter within the scope of an agency or employment of the declarant for the party and was made before the termination of the agency or employment . . . .

Model Code of Evidence rule 508 (1942).

technically have been admissible, it would not sufficiently support a finding of an earlier purpose to destroy Top Service's business for its exclusion to require reversal of this judgment.

Plaintiff contends that its case did not depend solely on proof of Allstate's wrongful motive. It argues that, contrary to the trial court's conclusion, Allstate would not be privileged to interfere with plaintiff's business relations by unlawful or otherwise improper means even in pursuit of its own business objectives. As unlawful or improper practices, plaintiff points to defendant's disparagment of its services, the price discriminations discussed in Part II, below, and violation of other statutory policies.[16] Plaintiff's contention may well be a correct view of the law, as we have reviewed it above, but it does not help plaintiff on this appeal. The difficulty is that the case was submitted to the jury solely on the theory of liability for purposely seeking to harm plaintiff's business.[17] Even if defendant might also have been liable on an alternative theory of tortious interference by improper means, we cannot reinstate the verdict on that theory, which was not presented to the jury.[18] Since the trial court did not

[16]Plaintiff cites ORS 646.608(1)(h), which makes it an unlawful trade practice to disparage the goods, services, property or business of another by false or misleading representations of fact, and ORS 746.230(1) which deals with unfair insurance claim settlement practices.

[17]The jury was instructed as follows:

Plaintiff must prove by a preponderance of the evidence that Defendant designed its conduct to cause customers or prospective customers not to deal with Plaintiff. Under Plaintiff's pleadings, purpose to achieve that result must be Defendant's sole motivating force. Actions which have the unintended effect of deterring people from dealing with Plaintiff are not sufficient to meet this test. This is true even though the defendant knows that its acts may result in damage to the plaintiff. Knowing that an act may bring about a result is quite different from actually intending to bring it about, and simply the knowledge that harm will occur as a result of Defendant's actions is not sufficient to show the defendant had a purpose to cause the harm.

[18]Plaintiff has not assigned as error the trial court's refusal to give its requested instructions on this theory, so we do not have occasion to decide whether these instructions should properly have been given in the form requested. *See, e.g., State v. Brown,* 245 Or 245, 246, 421 P2d 692 (1966); *Dunkelberger v. American Mail Line, Ltd.,* 230 Or 1, 10-11, 367 P2d 398 (1961); Or Sup Ct R 7.19.

err in its ruling under the theory on which the case was submitted, the judgment on the first cause of action must be affirmed.

## II. *The Price Discrimination Claim.*

In its second cause of action plaintiff claimed treble damages under ORS 646.140 for lost profits due to unlawful price concessions obtained by Allstate from competing body shops. This claim depends on proof of the relevant elements defined by the "Antiprice Discrimination Law," ORS 646.010-646.180.[19]

The prohibitions of this law are mostly addressed to the purveyor of goods or services who grants the forbidden concession. The obligation of the recipient is stated in ORS 646.090, which reads:

> No person engaged in commerce or food commerce, or both, in the course of such commerce, shall knowingly induce or receive a discrimination in price which is prohibited by ORS 646.040 to 646.080.

Thus the injured plaintiff in an action under ORS 646.140 or 646.150 must show (1) that the defendant was engaged in "trade or commerce within this state," ORS 646.020, (2) that the defendant induced or received a discrimination in price, (3) that this occurred in the course of such commerce, (4) that the price discrimination was one prohibited by ORS 646.040 to 646.080, (5) that the defendant induced or received the forbidden price concession "knowingly." Plaintiff must also show that he sustained damages from defendant's actual or threatened violation of the statute, but damages equal to the amount of the unlawful discrimination are "conclusively presumed." ORS 646.160. The fourth of these elements of a case against the recipient of a discriminatory concession requires proof that the

---

[19] Plaintiff requested an injunction in addition to damages under the statute. Because plaintiff sought equitable relief, the price discrimination claim apparently should have been tried as a suit in equity. ORS 646.140; *see Redmond Ready-Mix, Inc. v. Coats,* 283 Or 101, 582 P2d 1340 (1978). The request for an injunction was not pursued below, however, and the damage claim was tried to a jury. Consequently, we will treat the action as one at law. *See* ORS 646.150.

concession was a violation of the statute by his seller or purveyor. In this case, the section which plaintiff apparently claims to have been violated is ORS 646.040.[20]

■ Proof of a violation of ORS 646.040 in the present context, in turn, requires (1) that the seller or purveyor was engaged in commerce, (2) that he "directly or indirectly" discriminated in price "between different purchasers of commodities, or services or output of a service trade, of like grade and quality," (3) that this occurred in the course of such commerce, as above, (4) that the effect of "such" discrimination may be substantially (a) to lessen competition in any line of commerce, or (b) to tend to create a monopoly in any line of commerce, or (c) to injure, destroy or prevent competition (i) with either party to the discriminatory concession or (ii) with customers of either of them.[21]

---

[20] Plaintiff's pleadings and briefs are not explicit in this respect, but they do not argue a violation of ORS 646.080, which appears to be concerned with commodities or services "bought for resale." While, for the purposes of this opinion, we treat Allstate as a "purchaser" of repairs (including parts and materials) which it was obligated to insurance claimants to pay, plaintiff does not contend that Allstate negotiated these repair services "for resale" to its claimants.

[21] ORS 646.040(1) provides:

It is unlawful for any person engaged in commerce or food commerce, or both, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities, or services or output of a service trade, of like grade and quality or to discriminate in price between different sections, communities or cities or portions thereof or between different locations in sections, communities, cities or portions thereof in this state, where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.

The word "such" quoted in the text would literally forbid a particular act of price discrimination if "such" discrimination, i.e. discrimination of that type, might injure competition. However, on the basis of decisions under the Robinson-Patman Act, 15 USC 13(a) (1976), on which this statute was patterned, we read the word to result only from the deplorable habit of draftsmen to misuse "such" for "the," "this," or "that," so that the section requires proof of potential injury to competition from the particular discriminatory price. See, e.g., FTC v. Morton Salt Co., 334 US 37, 46 (1948);

Moreover, subsection (2) of ORS 646.040 excludes certain practices, especially cost-based price differentials based on quantity, which however are not involved here.[22]

Under the Federal Robinson-Patman Act the allocation of the burden to prove these elements of violation and defense in a case against the recipient of concessions has been complex and controversial. *See Automatic Canteen Co. of America v. FTC,* 346 US 61 (1953), Kintner, A Robinson-Patman Primer 254-262 (1970), Shniderman, Price Discrimination in Perspective 139-147 (1977). It is easier for the Federal Trade Commission to assume a large share of that burden under the federal law than it is for injured plaintiffs under the state law, who are likely to be smaller enterprises than a defendant who can obtain a price concession. ORS 646.050 provides that once the discrimination itself is shown, "the burden of rebutting

---

*Continental Baking Co. v. Old Homestead Bread Co.,* 476 F2d 97, 103 (10th Cir), *cert denied,* 414 US 975 (1973); Rowe, Price Discrimination Under the Robinson-Patman Act §§ 6.4, 6.8 (1962). This usage and its interpretation followed that of the Clayton Act. *See, e.g., George Van Camp & Sons v. American Can Co.,* 278 US 245, 252-253 (1929); *American Can Co. v. Ladoga Canning Co.,* 44 F2d 763, 766 (7th Cir 1930), *cert denied,* 282 US 899 (1931); McAllister, *Sales Policies and Price Discrimination Under the Clayton Act,* 41 Yale L J 518, 520, 524 (1932).

[22] ORS 646.040(2) provides:

Subsection (1) of this section does not prevent:

(a) Differentials which make only due allowance for differences in the cost of manufacture, sale or delivery, resulting from the differing methods or quantities in which the commodities are sold or delivered to purchasers.

(b) Persons engaged in selling goods, wares or merchandise, or service or output of a service trade, in commerce from selecting their own customers in bona fide transactions and not in restraint of trade.

(c) Price changes from time to time where in response to changing conditions affecting the market for or marketability of the goods concerned, such as but not limited to actual or imminent deterioration of perishable goods, obsolescence of seasonal goods, distress sales under court process, or sales in good faith in discontinuance of business in the goods concerned.

It should be noted that the defense of cost differentials applies only to commodities, not services.

the prima facie case thus made by showing justification is upon the person charged with the violation."[23] While this section applies most directly to cases against the discriminating seller, no reason is immediately apparent why the same allocation should not apply when the seller's violation of the statute is an element in a case against a recipient of the price concession.

In the present case, plaintiff contended that the following constituted unlawful price discriminations obtained by Allstate from plaintiff's competitors. First, there was evidence from which the jury could find that Allstate asked Top Service to give it a discount on the hourly rate for labor on repairs for which Allstate had to pay, which Top Service declined to do, and that Allstate did receive a five percent discount from Gold Coast Body Shop. Second, Allstate's estimates of repair costs used a schedule of painting costs developed by Allstate itself, which was substantially lower than the manuals otherwise used by body shops to estimate these painting costs. In negotiating the total price of a repair job with body shops, Allstate requested and received acceptance of its paint schedule from competing shops, though not from Top Service, and the jury could infer that other customers of the competing shops were charged for painting at a higher rate. Third, there was evidence from which the jury could find that competing shops, in order to get Allstate's business, sometimes omitted

---

[23] ORS 646.050 provides:

Upon proof being made, in any suit or other proceeding in which any violation of ORS 646.010 to 646.180 is at issue, that there has been discrimination in price, or in services or facilities furnished, or in payment for services or facilities rendered or to be rendered, the burden of rebutting the prima facie case thus made by showing justification is upon the person charged with the violation; but this section does not prevent a seller rebutting the prima facie case so made by showing that his lower price, or the payment for or furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor or the services or facilities furnished by a competitor.

repairs to the vehicles of Allstate's insurance claimants which Allstate's adjusters did not wish included in the claim for which it was obligated. This third charge, however, is not a discrimination in price for services "of like grade and quality" under ORS 646.040. Its essence is that other body shops were willing to make repairs of lower grade or quality for Allstate than for other insurance companies, not that they charged less for the repairs that they did make.

With respect to the first two charges, defendant argues generally that the concept of price discrimination, which was designed to deal with differences in the prices charged to different contemporaneous buyers of identical merchandise, does not fit the situation of individually negotiated transactions involving case-by-case estimates and judgments. No doubt proof of discrimination in such situations is more difficult, but since the Oregon statute extends beyond goods or commodities to "services or output of a service trade," individual service transactions cannot be excluded altogether. Doubtful as it might be to infer discrimination in such transactions merely from evidence of price differences in comparable sales, when there is direct evidence of a price concession or advantage to one buyer that is identifed as such, a prima facie case of discrimination has been made out. Defendant contends that there was nothing to show that the "5 percent discount" noted on estimates of Allstate jobs by Gold Coast Body Shop was a discount from a "standard price," but the jury could infer that the words meant a discount from the price that Gold Coast would have charged another customer for the same work. As the court noted in *W. J. Seufert Land Co. v. National Restaurant Supply Co.,* 266 Or 92, 111, 511 P2d 363 (1973), the purpose of the act is to protect the public from "any scheme of special concessions or rebates, any collateral contracts or agreements or any device of any nature whereby discrimination is, in substance or fact, effected," quoting ORS 646.010. Similarly, the substitution of Allstate's schedule to

estimate the cost of painting for the schedules in other manuals is plainly a matter for negotiation; but when a jury could infer that Top Service's competitors allowed Allstate a lower rate for painting than they charged their other customers, a prima facie case of discrimination is shown. Of course, it is only a prima facie showing of one of the elements under ORS 646.040. The justification of meeting competition urged by defendant is a matter of defense under ORS 646.050, which the jury could resolve against defendant.[24]

■ Assuming that the first three requirements of ORS 646.040 listed above have been met, plaintiff's case requires evidence that the price concessions Allstate received from Top Service's competitors substantially threatened to have one of the anticompetitive effects stated in that section. This issue was submitted to the jury under instructions which focused almost entirely on competition among body repair shops. These instructions stated repeatedly that there "must be an injury" to competition, once that there "must be a reasonable probability" of an effect on competition, and once "a reasonable possibility" of an effect on competition.[25] The trial court allowed judgment notwithstanding the verdict for plaintiff on this cause of

---

[24]Defendant also argues a cost justification for its paint schedule, but this does not justify different pricing for different customers and in any event is not a defense under ORS 646.040(2) with respect to services. See note 22 *supra.*

[25]The trial court stated:

[F]ifth, there must be an injury to competition between body shop businesses. Injury to an individual competitor is not sufficient to hold the defendant liable; sixth, the injury to competition must have been, one, to reduce competition between body shops or, two, to tend to create a monopoly in the body shop business or, three, to injure, destroy or prevent competition with any person who grants or knowingly receives benefits of a price difference; seventh, there must be a reasonable probability that the price difference will have an effect upon competition; eighth, the effect on competition of price differences must be substantial; ninth, an injury to competition must be caused by the alleged price differences; . . .

action in part for lack of "proof of injury to the health and vigor of the competitive process as required by law." Reading this to mean proof of actual injury, plaintiff points out that potential as well as present substantial lessening of competition satisfies the statute. That is, of course, correct. *See Redmond Ready-Mix, Inc. v. Coats,* 283 Or 101, 582 P2d 1340 (1978). Moreover, plaintiff is not precluded from arguing such a potential anticompetitive effect merely because plaintiff itself remains a successful or even dominant competitor. *See Utah Pie Co. v. Continental Baking Co.,* 386 US 685 (1967).

However, plaintiff does not point to any evidence of actual or potential lessening of competition or incipient monopolization in the relevant market, either among body repair shops or among automobile insurance companies. Plaintiff's brief merely states that "the jury was entitled to infer that such discrimination would result in the injury to competition both among insurance companies and among body shops." It does not cite any evidence in the transcript from which the jury might draw such an inference. The economic effects of Allstate's negotiations for reduced rates for repairs or painting on competition among repair shops or insurance companies are not self-evident nor a matter within the common sense of jurors. Plaintiff does not claim that Allstate bargained for exclusive reductions, not available to other customers of the body shops, or that Allstate would not let other shops than its preferred "competitive shops" meet the estimates its adjusters calculated and thus compete to repair the cars of Allstate's insurance claimants. If there were actual or potential anticompetitive effects

---

The need to find injury to "competition" was repeated six more times in general terms. In the context, the notion that price advantages to Allstate in Coos Bay might substantially affect competition among automobile insurers or among persons whose automobiles were repaired at different costs could have occurred to the jury only from these abstract references. In any event, this would have been sheer speculation in the absence of evidence.

of the discounts and paint schedules—the actions which we have said could be found to be discriminatory—they are not shown in this record.[26] The trial court accordingly did not err in allowing the motion for judgment n.o.v. on this ground. Since the judgment n.o.v. for defendant was correctly granted, we do not reach the additional, and difficult, question what elements of the underlying violation of ORS 646.040 a defendant must have known in order to be liable for "knowingly" inducing or receiving an unlawful price discrimination under ORS 646.090. *Cf.* ORS 646.050, discussed above.

The judgment is affirmed.

---

[26] Plaintiff also argues that if other insurance companies are driven to insist on less than complete repairs, shops like Top Service that will not comply may be driven out of business; but as we have stated, this is not a price discrimination.