OCEANSIDE RECREATION, INC. et al,
*Appellants,*

*v.*

SOUTHWELL,
*Respondent.*

(A8308-04924; CA A36200)

728 P2d 58

James P. Caher, Eugene, argued the cause for appellants. With him on the briefs was Armstrong, McCullen & Philpott, P.C., Eugene.

Thomas W. Brown, Portland, argued the cause for respondent. With him on the brief was Cosgrave, Kester, Crowe, Gidley & Lagesen, Portland.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

BUTTLER, P. J.

## BUTTLER, P. J.

Plaintiffs brought this action to recover damages which they claim to have suffered as a result of Liming's and Ulmer's (sellers) breach of a land sale contract and Southwell's (defendant) alleged tortious interference with that contract. The trial court granted defendant's motion for summary judgment and entered judgment accordingly.[1] Plaintiffs appeal, contending that the court erred, because a genuine issue of material fact exists. We affirm.

On December 24, 1981, plaintiffs entered into a land sale contract, under which they agreed to purchase from sellers commercially developed real property. The contract contained a provision by which sellers agreed to subordinate their vendors' interest in the property to a mortgage to an institutional lender if plaintiffs were able to obtain a loan for future improvements to the property. Sellers' obligation to subordinate was conditioned on their written consent to the proposed improvement and on the unpaid balance on the contract being reduced to $450,000. Sellers agreed not to withhold their consent unreasonably, but their subordination obligation was limited to the lower of the cost of the improvements or $500,000.

On September 23, 1982, plaintiffs notified sellers of their intent to exercise their right to require sellers' subordination in order to secure a construction loan in the amount of $500,000. Extensive negotiations followed, after which, on March 30, 1983, sellers signed appropriate subordination agreements that had been prepared by defendant, the attorney who had represented sellers throughout their dealings with plaintiffs.

On March 31, 1983, plaintiffs' project engineer went to defendant's office to pick up the signed documents, which he intended to deliver that day to the escrow agent in the transaction. Defendant informed him that he would not release the signed documents unless plaintiffs would agree to pay sellers' related attorney fees and the fee of sellers' consulting engineer and also produce a signed construction contract covering the work to be done. Plaintiffs refused.

---

[1] Plaintiffs' claim against sellers was apparently settled, and sellers were dismissed from the action.

On April 11, 1983, the escrow agent notified the parties that plaintiffs had deposited in escrow $75,000, an amount sufficient to reduce the unpaid balance on the land sale contract to $450,000. On April 12, 1983, plaintiffs contacted defendant personally and demanded that he release the signed documents. He refused. The same day, Dwyer, plaintiffs' attorney, telephoned defendant to discuss the situation. What was said in the course of that conversation is disputed. Dwyer testified by deposition that defendant told him that sellers had not yet signed the documents and that they were presently vacationing in Hawaii. Defendant claims that Dwyer asked him if he was holding signed papers *in escrow;* he said that he was not.

On April 19, 1983, plaintiffs telephoned sellers, who had returned from Hawaii the day before, and were reassured by them that they had signed the subordination agreements. Further negotiations ensued but were unproductive. On May 31, 1983, plaintiffs lost their loan commitment, allegedly as a result of their failure to obtain the signed subordination agreements before their loan commitment expired. Subsequently they filed for relief in bankruptcy, which, they alleged, could have been avoided if defendant had released the signed documents on or before April 12, 1983, which was after they had deposited sufficient funds in escrow to reduce the contract balance to $450,000.

Tort liability for intentional interference with contractual or other economic relations arises out of either "the pursuit of an improper objective of harming plaintiff or the use of wrongful means that in fact cause injury to plaintiff's contractual or business relationships." *Top Service Body Shop v. Allstate Ins. Co.,* 283 Or 201, 582 P2d 1365 (1978). Here, plaintiffs contend that defendant tortiously interfered with their contractual relationship with sellers by withholding, through wrongful means, the signed subordination agreements on April 12, 1983. They do not challenge the propriety of defendant's motives and concede that there is no issue of fact with respect to his claim that sellers, before leaving for Hawaii, had instructed him not to release the signed documents unless plaintiffs guaranteed payment of sellers' attorney and engineering fees and tendered a signed construction contract.

On appeal, plaintiffs contend that there are several genuine issues of material fact. Only one, however, merits discussion: defendant's alleged misrepresentation to Dwyer. Defendant concedes that what was said presents an issue of fact. He argues, however, that that issue is not material, because, even if he misrepresented the status of the subordination agreements to Dwyer in the course of their telephone conversation and even if that misrepresentation constitutes the use of "wrongful means,"[2] it had no bearing on plaintiffs' failure to close their loan before the commitment expired.

Plaintiffs argue that, if Dwyer had been told the truth, he might have negotiated a compromise with defendant or might have advised plaintiffs to agree to the imposed conditions. Although there is no evidence that plaintiffs could have obtained a signed construction contract, we will assume, viewing the evidence in the light most favorable to plaintiffs, that they could have done so. Further, defendant testified that, if plaintiffs had submitted either signed agreements to pay sellers' attorney fees or a signed construction contract, he would have contacted sellers in Hawaii to discuss the situation.

The fact remains, however, that plaintiffs were told on April 19, 1983, that sellers had signed the subordination agreements. There is no contention that, as of that date, an offer to comply with the previously communicated conditions would have been rejected. Plaintiffs' loan commitment did not expire until May 31, approximately six weeks later. In other words, plaintiffs were in virtually the same position on April 12, 1983, that they were in on April 19, 1983. They were faced with the same options and either were unable or unwilling to comply with the conditions. Therefore, any misrepresentation by defendant was not, as a matter of law, the cause of plaintiffs' failure to obtain the signed subordination agreements and to close their loan commitment. Accordingly, whether defendant made misrepresentations to Dwyer on April 12, 1983, was not material with respect to plaintiffs'

---

[2] Plaintiffs also contend that the tactics employed by defendant throughout the negotiations, in particular his failure to inform them earlier that additional conditions precedent to subordination would be imposed, constitute wrongful means. However, defendant, as the sellers' attorney, was not free to ignore their instructions to him. Complying with the clients' instructions under these circumstances does not, as a matter of law, constitute "wrongful means."

claim against defendant. There being no genuine issue of material fact, the trial court did not err in granting defendant's motion for summary judgment.

Affirmed.