Argued and submitted March 2, 1994, affirmed March 22, petition for review denied
May 23, 1995 (321 Or 246)

## UNITED EMPLOYER
## BENEFIT CORPORATION,
*Appellant,*

*v.*

## DEPARTMENT OF INSURANCE
## AND FINANCE OF THE
## STATE OF OREGON;
and Qual-Med Oregon Health Plan, Inc.,
an Oregon corporation,
*Respondents.*

(91C-11561; CA A77744)

892 P2d 722

David F. Sugerman argued the cause for appellant. With him on the briefs were Richard A. Uffelman, Paul & Sugerman and Hansen & Uffelman.

Jas. Adams, Assistant Attorney General, argued the cause for respondent Department of Insurance and Finance. With him on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Thomas W. Sondag argued the cause for respondent Qual-Med Oregon Health Plan, Inc. With him on the brief were Michael J. Lilly and Lane Powell Spears Lubersky.

Before Riggs, Presiding Judge,* and De Muniz and Leeson, Judges.

De MUNIZ, J.

---

* Riggs, P. J., *vice* Rossman, P. J., retired.

.

## De MUNIZ, J.

Plaintiff, United Employer Benefit Corporation (UEBC), appeals from a directed verdict for defendants, the Oregon Department of Insurance and Finance (DIF)[1] and Qual-Med Oregon Health Plan (Qual-Med), on its takings claims under the federal and state constitutions. UEBC also appeals from a directed verdict for Qual-Med on plaintiff's claim for intentional interference with business relations. We affirm.

UEBC was incorporated in 1976 as an insurance marketing agency and began selling an insurance trust product to small businesses. Norm Geertsen, UEBC's founder and president, explained the concept of the insurance trust:

> "The program was developed primarily because back in the '60s and '70s it was very difficult for small business organizations to buy group life and health insurance at group rates, and the trust concept was to bring businesses of like natures, be it retail, manager, etcetera, together in large pools, business-by-business, and that was the concept of the multi-employer trust."

The trust product included various forms of life, disability and health insurance. Originally, UEBC marketed the North American Life and Casualty (NALAC) trust in combination with a health and dental insurance program from a California insurer. Eventually, UEBC created and began marketing the Oregon Employer Benefit Program (OEBP), an insurance package that included life and disability insurance from NALAC and health and dental insurance from Greater Oregon Health Service (GOHS), an Oregon domestic health insurer.

As a marketing company, UEBC worked primarily with independent insurance brokers. It held broker seminars in which UEBC representatives explained OEBP and discussed its benefits. Approximately 90 percent of UEBC's sales of OEBP to small businesses were made by independent brokers, while the remaining 10 percent were made directly by UEBC's sales personnel. According to Geertsen, UEBC's customers were "the group of policyholders out there that are

---

[1] The Department of Insurance and Finance is now the Department of Consumer and Business Services. Or Laws 1993, ch 744, § 10.

paying the premium, as well as the brokers that we deal with as the go-between[.]'' UEBC's income came largely from administrative fees; it charged a flat noncommissionable fee of $17.50 per month per group of policies sold to businesses, approximately $1.50 per individual per month in each group that had health insurance, and $1.25 per individual per month in each group with dental insurance. For the 10 percent of sales made directly by UEBC, UEBC also received the gross commission from the insurer.

Every sale of OEBP generated important customer information about insurance brokers and the individuals in the insured group, including the number and identity of the individual insureds, their geographic location and number of dependents, the type of coverage purchased and the time period during which the policy remained in effect. The information also included the expiration dates for the customers' policies. Upon completion of each sale, UEBC forwarded that customer information to United Administrators, Inc. (UAI), a related administrative company that processed the data and compiled a customer information list. By 1990, UEBC's customer list of Portland area policyholders contained information on 1,152 insured groups, which included approximately 11,000 individuals. By providing UEBC with the ability to locate and identify OEBP policyholders and the knowledge of when those policies were due to expire, the customer list gave UEBC a substantial competitive advantage over other insurance marketers, in terms of its efforts to retain those policyholders. Only UEBC, GOHS, UAI and Smith Management, the company that managed GOHS, had access to the customer information list.

When the UEBC-GOHS relationship was formed in the 1970's, UEBC and GOHS entered into an oral agreement in which GOHS agreed to supply the health insurance product for OEBP that UEBC marketed. The agreement could be terminated by either party at any time. In the event of such termination, UEBC had the right to "roll over" the policies to a new insurer, i.e., UEBC could use the customer information list to offer competing policies to GOHS policyholders enrolled in OEBP. The agreement was never put in writing.

Due to financial difficulties, GOHS was placed in receivership by DIF in March 1990. The Director of DIF was

appointed receiver by the circuit court and ordered, *inter alia*, to "take possession of all property of [GOHS] and conduct the business thereof" and to "perform and do all acts * * * necessary, advisable or expedient" to achieve the financial rehabilitation of GOHS. When the company went into receivership, it was forbidden from issuing new policies. GOHS informed UEBC to stop marketing its health insurance product, so that no new policies would be written. In fact, due to its concern over the financial stability of GOHS, UEBC had stopped marketing new policies in 1989.

The Director of DIF, acting as the receiver for GOHS, determined that the first step in rehabilitating GOHS was to raise capital by selling some of GOHS' assets. It was determined that individual and employer group policies that had been issued by GOHS in the Portland area were the most marketable. Roughly two-thirds of those GOHS policies had been sold by UEBC as a part of OEBP. In May, after a bidding process, the Director and GOHS accepted an offer, made by Qual-Med, to purchase those policies for $2 million. Qual-Med then signed a nonbinding letter of intent, which contemplated negotiation of a binding agreement between GOHS and Qual-Med, subject to the Director's approval.

In early June, before GOHS and Qual-Med had reached a binding agreement, Qual-Med learned that Sisters of Providence Good Health Plan was attempting to market a competing health insurance package to the Portland area GOHS policyholders. Concerned that Good Health Plan was directing its marketing efforts toward the precise block of business that Qual-Med was seeking to purchase, Qual-Med sent a letter to Terry Meagher, DIF's Chief Examiner of Domestic Insurers, requesting that DIF take steps to stop Good Health Plan's solicitation. It also sent a copy of the letter to Good Health Plan, which voluntarily withdrew its solicitation.

Qual-Med also was concerned that UEBC, which had placed two-thirds of the GOHS policies that Qual-Med sought to purchase and which, by virtue of the customer list, possessed customer information on those policyholders, might attempt to direct those policyholders to another insurance carrier. Counsel for Qual-Med telephoned Meagher on June 20 and told him that Qual-Med would not purchase the

GOHS policies without an informal assurance that DIF would take action "to protect" the transfer of the policies to Qual-Med. After their conversation, Qual-Med's counsel advised Meagher by letter that Qual-Med "now understands that the Director would intervene to prevent a similar attempt at piracy [referring to Good Health Plan's solicitation efforts in early June], but some risk of adverse marketing before the administrative transfer date remains." Sometime in late June, but before the closing of the sale, Qual-Med officials met with the Director to voice their concerns about the possibility of UEBC contacting the GOHS policyholders and steering them to another insurance carrier. The Director said that he would do what he could to protect the transfer of the GOHS policies to Qual-Med.

On June 22, Qual-Med and GOHS entered into a binding written agreement transferring the Portland GOHS policies to Qual-Med. Pursuant to the agreement, Qual-Med was to pay GOHS $2 million and, effective June 30, was to assume the risk of the policies. Notice provisions in the GOHS policies required Qual-Med to provide most policyholders with 30 days advance notice of the termination of their GOHS policy and to inform them that, if they wished, they could obtain replacement coverage with Qual-Med. Qual-Med obtained GOHS' assurance that at least 55 percent of the transferred enrollees would agree to be insured by Qual-Med, and that, if that figure was not achieved, GOHS would transfer additional contracts from its non-Portland business until that percentage requirement was met. The Director approved the plan of acquisition on July 10.

GOHS formally terminated the UEBC-GOHS marketing agreement in early July. In May 1990, it had appeared possible to UEBC that GOHS would not come out of impairment, and UEBC had started aggressively seeking a new medical and dental insurance carrier to replace GOHS in OEBP. After talking with several different insurance carriers, including Qual-Med, UEBC contracted with Sisters of Providence Good Health Plan to provide health insurance and contracted with Standard Insurance Company of Oregon to provide dental insurance. UEBC and representatives from Good Health Plan then met with several Portland area insurance brokers and urged them to market the Good Health

Plan's health insurance package to Portland area GOHS policyholders. UEBC planned to begin marketing the reformed OEBP in July 1990.

On July 9, Qual-Med learned that Good Health Plan, in conjunction with UEBC, intended, through independent brokers, to renew its solicitation of the Portland GOHS business. Qual-Med counsel immediately contacted legal counsel for DIF and requested in writing that DIF take appropriate action "to prevent this new solicitation from proceeding any further." On July 11, DIF issued a news release that detailed the transaction between Qual-Med and GOHS and stated that DIF would consider any attempt to "roll-over" the policies purchased by Qual-Med to be a violation of the receivership order:

> "[DIF] will monitor any attempts to 'roll over' or replace the policies just purchased by Qual-Med. *I will view any effort to take over those policies to be in contempt of the court order appointing me as receiver,*' warned [the Director of DIF]. *'I will take appropriate action against any individuals involved in such activities.*' " (Emphasis supplied.)

The next day, pursuant to the Director's instructions, Meagher telephoned UEBC and Good Health Plan. He summarized the information contained in the news release and referred to the terms of the court order appointing the Director as GOHS's receiver. He also suggested that legal advice be sought before further marketing was attempted. One week later, representatives from UEBC, Qual-Med, GOHS, Good Health Plan and Standard Insurance met with DIF to discuss the situation. UEBC expressed its concern about being blocked by the press release from contacting the Portland customers to solicit their business for Good Health Plan and Standard. The Director suggested that UEBC come to some sort of mutually acceptable understanding with Qual-Med. UEBC said that it had already engaged in negotiations with Qual-Med, but they had proved unsuccessful. At that point, the Director

> "became very red-faced and he pounded his fist on the table and he told me [UEBC's representative] in a very loud tone that the Department had just taken $2 million from [Qual-Med] and that if it was a fight I wanted, it was a fight that I would get * * *."

UEBC was directed to refrain from marketing attempts aimed at the Portland customer base for six months to one year.

As a result of the press release, insurance brokers refused to attempt to roll-over the GOHS policyholders to Good Health Plan for fear of DIF revoking their insurance licenses. Good Health Plan and UEBC suspended most marketing efforts directed at the GOHS policyholders that were solicited through brokers, but UEBC continued to solicit their own customer base. DIF eased the marketing restrictions in March 1991, approximately eight months after the press release. At that time, attempts to revive GOHS had failed, and the company was being dissolved. UEBC filed for an injunction prohibiting DIF from further restricting UEBC's right to contact Portland customers. UEBC received assurances from the state that DIF would not interfere in any way with UEBC's marketing. However, because UEBC had been unable to contact the GOHS policyholders in the eight-month interim, its Portland area customer base had evaporated. UEBC estimated that it would have retained 90 percent of its Portland customer base had it not been precluded from soliciting Portland-area GOHS policyholders.

UEBC brought this action against DIF and Qual-Med for inverse condemnation, claiming that the actions of DIF and Qual-Med had deprived UEBC of its private property rights in the Portland area block of business without compensation, in violation of the state constitution. UEBC also claimed that DIF's actions violated the federal constitution. Lastly, UEBC argued that Qual-Med had tortiously interfered with its business relations by asking DIF to restrain its marketing abilities. UEBC claimed that Qual-Med's request had interfered with UEBC's right under the UEBC-GOHS contract to use the customer list and had interfered with UEBC's prospective contracts with Portland area customers. After a week of trial, the trial court granted defendants' motions for directed verdicts on all claims. With respect to the inverse condemnation claims, the trial court apparently based its ruling on the premise that UEBC had no protected property interest in the customer list. With regard to the tortious interference claim against Qual-Med, the trial court concluded that Qual-Med could not have interfered with

UEBC's contract right to use the customer list because UEBC had no protected right. The court also held that Qual-Med's actions were not unlawful and therefore not tortious with respect to prospective contracts with Portland customers.

■■ On appeal of the trial court's directed verdict for defendants, we view the evidence in the light most favorable to UEBC. *Paulson v. Western Life Insurance Co.*, 292 Or 38, 40 n 1, 636 P2d 935 (1981). Resolving all factual inferences in favor of UEBC, the question on review is whether judgment was properly directed as a matter of law. *See Resser v. Boise-Cascade Corporation*, 284 Or 385, 389, 587 P2d 80 (1978).

■■ Plaintiff pled claims of inverse condemnation under both the state and federal constitutions, alleging that DIF's action constituted a taking of private property. We will assume, for the purpose of this opinion, that some things are as UEBC claims them to be: that the customer list is a property interest and that the Director's acts were state action, purportedly taken in his capacity as receiver for GOHS. We cannot, however, accept UEBC's characterization of the Director's acts as a "taking."

DIF promised, through its Director's press release and oral pronouncements, that *if* UEBC solicited customers from the list, *then* DIF would seek a court determination that UEBC was in contempt of the court's order appointing the Director as receiver for GOHS. Naturally, UEBC could have opposed any move by DIF to have it held in contempt; it also could have challenged DIF's actions administratively. *See, e.g.*, ORS 731.240; ORS 183.490. It could have sought an independent determination as to the legality of DIF's action aimed at restricting UEBC's right to solicit customers from the list. UEBC chose to do none of those things. It disregarded the Director's admonitions and continued to solicit customers from the list, as did other insurers. However, most brokers refrained from soliciting customers because they felt threatened by the Director's actions.

It is not our purpose here to either condone or condemn DIF's acts or to comment on the appropriateness of certain responses to nonbinding agency conduct. *See Johnson v. Dept. of Fish and Wildlife*, 114 Or App 335, 835 P2d 133

(1992). Apart from questions concerning whether the Director may have had the authority pursuant to ORS 734.220 to prohibit solicitation from the customer list, or whether UEBC was, in fact, damaged by those acts, we conclude that the Director's actions simply were not sufficient to effect a taking under either the state or federal constitution. A mere threat to take action on the occurrence of some uncertain future event is not a taking. As the Supreme Court said in *Suess Builders v. City of Beaverton*, 294 Or 254, 258, 656 P2d 306 (1982), to be considered a taking, the government's action must have the *legal* effect of rendering the property useless. The director's actions raised no *legal* impediment to UEBC's use of the list. The fact that many brokers chose not to solicit customers on behalf of UEBC out of fear of reprisal by DIF does not give rise to a taking by DIF.

On the tortious interference claim against Qual-Med, UEBC asserts that the trial court erred in determining that Qual-Med's actions were not wrongful. UEBC claims that Qual-Med wrongfully interfered with UEBC's business relations by asking the Director to prevent UEBC's solicitation of the Portland customers. Although it is not clear whether UEBC is claiming that Qual-Med interfered with the UEBC-GOHS contract that gave UEBC the right to use the customer list or whether UEBC is claiming that Qual-Med interfered with UEBC's prospective business relations with the Portland customers, we assume the latter.

■ A case for intentional interference with prospective business advantage is

"made out when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself. Defendant's liability may arise from improper motives or from the use of improper means. They may be wrongful by reason of a statute or other regulation, or a recognized rule of common law, or perhaps an established standard of a trade or profession." *Top Service Body Shop v. Allstate Ins. Co.*, 283 Or 201, 209-10, 582 P2d 1365 (1978).

For UEBC to establish a claim, it must show that:

"'(1) [Qual-Med] intentionally interfered with the proposed relationship;

"'(2) [Qual-Med] interfered either with an improper motive or by using improper means; and

" '(3)   As a result [UEBC] was damaged beyond just the fact of interference itself.' " *Ron Tonkin Gran Turismo v. Wakehouse Motors*, 46 Or App 199, 208, 611 P2d 658 (1980), *quoting Straube v. Larson*, 287 Or 357, 360, 600 P2d 371 (1979). (Footnote omitted.)

Qual-Med must have known of the plaintiff's prospective relationship and intentionally interfered with that relationship. *Glubka v. Long*, 115 Or App 236, 239, 837 P2d 553 (1992).

■   The parties seem to agree that (1) Qual-Med knew of UEBC's intentions to solicit the Portland customers; (2) Qual-Med interfered with UEBC's ability to solicit the Portland customers; and (3) UEBC was damaged. However, the parties disagree about whether Qual-Med's actions were "wrongful." UEBC argues that the trial court erred by finding that Qual-Med's actions were lawful and claims that there was evidence at trial that Qual-Med violated a "well-established common law rule," the constitution and a statute, ORS 746.160.[2] Qual-Med denies that its conduct was improper or unlawful.[3]

The evidence amply supports the conclusion that it was the brokers' response to the issuance of the press release that caused UEBC's injury. UEBC argues that Qual-Med caused DIF to issue the press release. Assuming, for the moment, that that act of requesting the press release would have been wrongful, there is no evidence that Qual-Med suggested or knew of the press release before it was issued. It is true that Qual-Med expressed concern over UEBC's competitive marketing; it sent letters to insurance competitors

---

[2] UEBC claims that Qual-Med's actions violated the common law rule that insurance agents have rights in their expiration information. UEBC also argues that Qual-Med's actions constituted a taking under color of state authority, in violation of Article 11, section 4. Lastly, UEBC claims that Qual-Med violated ORS 746.160, which provides that no person or insurer, "jointly or severally," shall do any act for the purpose of:

"(3)  Doing anything which is detrimental to free competition in the business or injurious to the insuring public."

UEBC claims that Qual-Med's agreement with DIF was injurious to free competition.

[3] Qual-Med also argues that its actions were a constitutionally privileged exercise of Qual-Med's right to lobby the government. Or Const, Art I, § 26; US Const, Amend I. Because we hold that Qual-Med's actions were not wrongful, we do not reach the issue of privilege. *Top Service Body Shop*, 283 Or at 210.

asking them to voluntarily avoid soliciting Portland customers, and it appears that some companies complied with that request. However, Qual-Med did not seek or issue the press release; DIF did. Even assuming that DIF's action was wrongful, its action was not Qual-Med's. The trial court did not err in directing a verdict in Qual-Med's favor on the interference claim.

Affirmed.